**FILED**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MAY 3 1 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| In Re Federal National Mortgage Association Securities, Derivative, and "ERISA" Litigation | MDL No. 1688 |
| In Re Fannie Mae Derivative Litigation | Consolidated Civil Action No. 04-1783 (RJL) |

**MEMORANDUM OPINION**
(May 31, 2007)

Before the Court are multiple motions to dismiss the claims in the First Amended

Consolidated Verified Shareholders' Derivative Complaint ("Amended Complaint") filed in

this action. The Amended Complaint names as defendants: (1) certain outside directors of

the Federal National Mortgage Association ("Fannie Mae") (*i.e.* Stephen B. Ashley, Kenneth

M. Duberstein, Thomas P. Gerrity, Ann Korologos, Frederic V. Malek, Donald B. Marron,

Anne M. Mulcahy, Joe K. Pickett, Leslie Rahl, H. Patrick Swygert, and John K. Wulff); (2)

two former senior executives (*i.e.* Franklin D. Raines and J. Timothy Howard); (3) the

current President and Chief Executive Officer of Fannie Mae, Daniel H. Mudd; and (4)

Fannie Mae itself. All defendants seek to dismiss the Amended Complaint for failure to state

a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) and for failure to make a

demand pursuant to Federal Rule of Civil Procedure 23.1. After reviewing the parties'

submissions, oral argument, and the applicable law, the Court GRANTS the defendants'

motions to dismiss for failure to make a demand pursuant to Federal Rule of Civil Procedure 23.1.[1]

## BACKGROUND

Fannie Mae is one of two (the other being Freddie Mac) federally-chartered government sponsored enterprises that serve the public policy of expanding home ownership to moderate and low-income families, in part, by supplying capital and liquidity for residential mortgages. The additional capital and liquidity provided by Fannie Mae, in turn, increases the market for 30-year fixed-rate mortgages and frees up banks' limited capital, allowing them to make more loans. Fannie Mae was established in 1938 by the federal government as a public entity. In 1968, Congress amended Fannie Mae's charter to make it a shareholder-owned company that operates on a self-sustaining basis. Indeed, its Board of Directors is composed principally of outside directors who are elected by the shareholders. The Chairman and officers of the company have neither the power to dismiss the outside directors, nor set their compensation. To the contrary, it is the Board of Directors who set the compensation of the officers and have the authority to remove them from office.

Fannie Mae is regulated by various governmental agencies, including the Office of Federal Housing Enterprise Oversight ("OFHEO"), the United States Department of Housing and Urban Development, the United States Department of Treasury, and the General Accounting Office. OFHEO's "mission" is ensuring the safety and soundness of Fannie

---

[1] Having dismissed the suit based upon the failure to make a demand pursuant to Rule 23.1, the Court sees no need to evaluate defendants' 12(b)(6) motions.

Mae. (*See* Federal Housing Enterprises Financial Safety and Soundness Act of 1992, 12

U.S.C. § 4501 *et seq.*; OFHEO Mission Statement, *available at*

http://www.ofheo.gov/Mission.asp (last visited May 31, 2007).) OFHEO's oversight

involves reviewing the company's internal controls, corporate structure, financial solvency,

capital reserves, and accounting policies. (*See generally* OFHEO Report to Congress, June

15, 2002 ("2002 OFHEO Report") at 22-42 (detailing OFHEO's examination of Fannie

Mae's operations) (attached as Ex. 3 to Stern Decl.).) OFHEO then reports annually to

Congress on its findings. (*Id.*) OFHEO reviews Fannie Mae's executive employment

agreements and executive compensation and approves the termination benefits provided

under those agreements. *See* 12 U.S.C. §§ 4518(a), 1723a(d)(3)(B). Pursuant to statute,

Fannie Mae officers' compensation must be set where "the board of directors determines [to

be] reasonable and comparable with compensation for employment in other similar

businesses (including other publicly held financial institutions or major financial service

companies) involving similar duties and responsibilities." *Id.* § 1723a(d)(2). Plaintiffs

acknowledge that to ascertain what comparable executives at similar corporations received

in compensation, the Board retained Johnson Associates and the Board's Compensation

Committee retained Semler Brossy Consulting Group. (Am. Compl. ¶ 400.)

On September 22, 2004, OFHEO released an interim report concluding that Fannie

Mae had misapplied FAS 91 and FAS 133, which are generally accepted accounting

principles ("GAAP"), that Fannie Mae had inadequate internal controls, and that OFHEO no

longer had confidence in certain members of Fannie Mae's management. (Am. Compl. ¶

49.)  Shortly thereafter, the Board expanded the authority of a Special Review Committee

that had previously been created and vested it with the authority to investigate the allegations

in the OFHEO Report.  (*See* Fannie Mae, Form 8-K at 99.2 (Dec. 21, 2004) (attached as Ex.

7 to Stern Decl.).)  The Committee retained former United States Senator Warren Rudman

and his law firm (*i.e.* Paul, Weiss, Rifkind, Wharton & Garrison LLP) to carry out this

investigation.[2]  (*Id.*)  Within days, putative derivative plaintiffs began filing shareholder

derivative suits. In total, ten plaintiffs commenced eleven shareholder derivative actions[3] and

---

[2] The report was issued on February 23, 2006 and concluded that "the Board endeavored to operate in a manner consistent with its fiduciary obligations and evolving corporate governance standards. The Board was open to examination by third parties and responsive to outside commentary, and it generally received high marks from outside observers." Senator Rudman also notes that, "[t]he Board, and in particular the Audit Committee, was sensitive to matters relating to accounting and financial reporting . . . . For example, the Board reacted quickly to the release of Freddie Mac's announcement in 2003 about accounting issues." Senator Rudman concluded that "[t]he Board also responded appropriately when it received indications that there were significant issues at the company. The Board has made considerable effort to examine and improve its structure, composition, policies, and practices." (*See* Report to the Special Review Committee of the Board of Directors of Fannie Mae, Executive Summary, Feb. 23, 2006, at 401 (attached as Ex. 16 to Stern Decl.).)

OFHEO issued its final report on May 23, 2006, but did not uncover any additional accounting irregularities.

[3] *Rudoff v. Raines, et al.*, C.A. No. 1:04-07688 (S.D.N.Y., filed Sept. 28, 2004); *Horn v. Raines, et al.*, C.A. No. 1:04-1783 (D.D.C., filed Oct. 15, 2004); *Arthur v. Raines, et al.*, C.A. No. 1:04-8294 (S.D.N.Y., filed Oct. 20, 2004); *Richard Mandel Trust v. Howard, et al.*, C.A. No. 1:04-1837 (D.D.C., filed Oct. 20, 2004); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust, etc. v. Raines, et al.*, C.A. No. 1:04-1852 (D.D.C., filed Oct. 25, 2004); *Rudoff v. Raines, et al.*, C.A. No. 1:04-1960 (D.D.C., filed Nov. 10, 2004); *Wayne County Employees' Ret. Sys. v. Raines, et al.*, C.A. No. 1:04-2228 (D.D.C., filed Dec. 23, 2004); *The Lillian Winston 1993 Trust v. Raines, et al.*, C.A. No. 1:05-0010 (D.D.C., filed Jan. 5, 2005); *Kellmer v. Marron, et al.*, C.A. No. 1:05-0037 (D.D.C., filed Jan. 5, 2005); *Bader v. Raines, et al.*, C.A. No. 2:05-0175 (D.N.J., filed Jan. 10, 2005); *Stern v. Raines, et al.*, C.A. No. 1:05-0352 (D.D.C., removed Feb. 18,

a books and records action under title 8, section 220 of the Delaware Code.[4]  The first of

these shareholder derivative actions was filed on September 28, 2004 in the United States

District Court for the Southern District of New York.  On that say, the following ten outside

directors sat on Fannie Mae's Board: Korologos, Marron, Ashley, Mulcahy, Malek, Pickett,

Duberstein, Swygert, Rahl, and Gerrity, and the following three corporate officers, Raines,

Howard, and Mudd, were serving as directors.  John Wulff, who is also named as a defendant

in this action, joined the Board as an outside director on December 9, 2004. (Am. Compl. ¶

85.)

On February 14, 2005, the Court consolidated all of the derivative actions and

appointed Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust ("Pirelli") and

Wayne County Employees' Retirement System ("Wayne County") as co-lead Plaintiffs. (*See*

Feb. 12, 2005 Mem. Op. and Order at 3-4.)  Plaintiffs filed a consolidated complaint on

September 26, 2005.  The following Spring, Fannie Mae announced on May 23, 2006 that

it had agreed to comprehensive settlements with OFHEO and the SEC.  As part of the

settlement with OFHEO, the Board agreed to a variety of corporate governance

improvements, including the addition of a Compliance Committee and a Risk Policy and

Capital Committee.  (*See In the Matter of The Federal National Mortgage Association*

---

2005).

[4] *Kellmer v. Fannie Mae*, C.A. No. 1:04-2084 (D.D.C., filed Dec. 1, 2004).  The Amended Complaint contains no count for a books and records action because the company produced certain documents to satisfy the books and records demand.

("*Fannie Mae*"), Consent Order, at 6-8 (dated May 23, 2006) (attached as Ex. 15 to Stern Decl.).)

On September 1, 2006, plaintiffs filed an amended version of the September 2005 Consolidated Complaint (*i.e.* the Amended Complaint). The Amended Complaint asserts two types of claims: (1) breach of fiduciary duties and gross mismanagement arising out of the company's misapplication of FAS 91 and 133 ("accounting-related claims") (Am. Compl. Counts I-IV); and (2) claims for corporate waste and unjust enrichment relating to the Board's approval of certain executives' compensation ("compensation-related claims") (Am. Compl. Counts V-VIII).

With regard to the demand requirement of Rule 23.1, plaintiffs claim that it would have been futile to make a demand on the Board for the company to pursue these claims. Defendants, not unexpectedly, contend that plaintiffs' Amended Complaint does not set forth facts sufficient to establish futility. To the contrary, they contend that a majority of the Fannie Mae's directors (seven of the thirteen) were not so lacking in independence or disinterest to prevent them from properly evaluating a demand by plaintiffs on the directors that Fannie Mae file suit in this matter. For the following reasons, this Court agrees with the defendants and DISMISSES plaintiffs' claims for failure to make the requisite Rule 23.1 demand upon the Board of Directors of Fannie Mae prior to filing this derivative suit.[5]

---

[5] Fannie Mae also raised the novel and fascinating argument in its Motion to Dismiss that, even in the event of Board disqualification, a derivative suit is not appropriate in this case because Congress essentially preempted them by empowering OFHEO to protect and vindicate Fannie Mae's shareholders' injuries and losses. (*See* Memorandum of Law in Support of Fannie

## ANALYSIS

### I.  Legal Standard

A complaint in a derivative suit must meet the procedural requirements of Rule 23.1 of the Federal Rules of Civil Procedure. *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991).  Under Rule 23.1, a plaintiff must set forth "with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort." *See Gaubert v. Fed. Home Loan Bank Bd.*, 863 F.2d 59, 68-70 (D.C. Cir. 1988) (affirming dismissal of derivative case because complaint failed the particularity requirement under Federal Rule or Civil Procedure 23.1, which the court noted exceeds that under Rule 8); *Siegman v. Tri-star Pictures, Inc.*, No. 9477, 1989 WL 48746, at *10 (Del. Ch. May 5, 1989), *aff'd in part, rev'd in part on other grounds*, *In re Tri-Star Pictures, Inc. Litig.*, 634 A.2d 319 (Del. 1993). Conclusory allegations that demand would have been futile are insufficient.  *See Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000); *Grimes v. Donald*, 673 A.2d 1207, 1216 (Del. 1996) (holding that a plaintiff must "allege with particularity why the stockholder was justified in not having made the effort to obtain board action"), *overruled in part on other grounds*, *Brehm*, 746 A.2d 244.  Federal Rule of Civil Procedure 23.1 "speaks only to the adequacy

---

Mae's Motion to Dismiss the Shareholder Derivative Causes of Action Against Fannie Mae And Its Directors For Failure to State a Claim Upon Which Relief Can Be Granted.)  However, because the Court is dismissing this suit based on Rule 23.1, it need not address this issue today.

of the shareholder representative's pleadings," and does not itself create a demand requirement. *Kamen*, 500 U.S. at 96 (explaining that "although Rule 23.1 clearly contemplates both the demand requirement and the possibility that demand may be excused, it does not create a demand requirement" (emphasis in original).

For the purpose of evaluating futility in this case, both parties agree that Delaware corporate law is the appropriate body of law to which this Court should look in deciding this motion. *See* 12 C.F.R. § 1710.10(b) (requiring the government-sponsored enterprises ("GSE's") to designate a body of corporate law, either state or model business code, to fill any gaps in OFHEO's governance requirements); (Fannie Mae Bylaws § 1.05 (designation of Delaware corporate law in response to OFHEO requirement) (attached as Ex. 14 to Stern Decl.)).

## II. *Plaintiffs' Claims*

Plaintiffs concede that they did not attempt to make a demand upon the Board that the company pursue the claims set forth in the Amended Complaint. Instead, plaintiffs assert that such an exercise would have been futile. In support of this contention, plaintiffs allege that each of the directors are incapable of adequately evaluating a demand that the Board take action against themselves and other former and current directors and officers of Fannie Mae. (Am. Compl. ¶¶ 91, 92.)

Moreover, to support their individual causes of action against the director defendants, plaintiffs allege that the thirteen original director defendants caused the company to:  restate

its earnings by at least $9 billion; lose over $31 billion in market capitalization; sell over $5 billion of securities to avoid being undercapitalized; be exposed to hundreds of millions of dollars in potential damages for securities fraud and ERISA violations; pay $400 million in civil penalties; incur over $420 million in professional and consultant fees to restate earnings; incur expenses associated with the restatement, regulatory examinations, investigations and litigation in excess of $1.3 billion; face possible delisting of Fannie Mae's stock; and limit the company's ability to compete in the marketplace. (*Id.* ¶ 94.)

Plaintiffs allege, and defendants essentially concede, that the three inside directors (*i.e.* Raines, Mudd, and Howard) are not "independent directors" under the Corporate Governance Guidelines because of their positions as officers of Fannie Mae. (*Id.* ¶ 96.) As to Mr. Duberstein, however, plaintiffs allege that although an outside director, he is not independent because of his business relationship (fostered by Raines) with Fannie Mae. (*Id.*) Moreover, plaintiffs assert that at least eight of the fourteen defendants (Raines, Mudd, Duberstein, Marron, Swygert, Malek, Korologos, and Gerrity) are conflicted due to their association with the Fannie Mae Foundation ("Foundation"), whose Board Mr. Raines chaired when the challenged grants were dispersed. (*Id.* ¶ 120.)

Finally, plaintiffs claim that at least seven of the individual directors have business and/or personal relationships with each other, or with immediate families of other defendants, that would conflict with their ability to objectively determine whether it would be appropriate

to bring suit against other Fannie Mae current and former officers and/or directors. (*Id.* ¶ 136.)

### III. Plaintiffs' Claims Are Dismissed for Failure to Make a Pre-Suit Demand

The Unites States Supreme Court has made it clear "that the decisions of a corporation–including the decision to initiate litigation–should be made by the board of directors or the majority of shareholders." *Kamen*, 500 U.S. at 101 (quoting *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 530 (1984)). As such, the Supreme Court has acknowledged that the board of a corporation controls any litigation, unless the court concludes that demand is "excused by extraordinary conditions" such as if the Board is incapable of acting independently and disinterestedly on behalf of the company. *See id.* at 96 (quoting *Ross v. Bernhard*, 396 U.S. 531, 534 (1970)); *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), *overruled on other grounds by Brehm*, 746 A.2d 244. Accordingly, before shareholders may file a derivative suit to pursue claims on behalf of the company, those shareholders must first demand that the board of directors file suit on behalf of the company. *See* Fed. R. Civ. P. 23.1. However, shareholders can avoid this pre-suit demand requirement if they can adequately demonstrate that demand should be excused because making it would have been futile. *See Grimes*, 673 A.2d at 1215-16, *overruled in part on other grounds by Brehm*, 746 A. 2d 244. To do so, the shareholders must plead particularized facts that raise a reasonable doubt about the disinterest and independence of a majority of the directors. *Id.*

Under Delaware law, the inquiry into whether a demand would be futile proceeds under either *Rales v. Blasband*, 634 A.2d 927 (Del. 1993) or *Aronson v. Lewis*, 473 A.2d

805.  When the alleged conduct at issue did not involve any affirmative action by the board

of directors, courts apply the test set out in *Rales*, which holds that demand is excused only

where "particularized factual allegations . . . create a reasonable doubt that, as of the time the

complaint is filed, the board of directors could have properly exercised its independent and

disinterested business judgment in responding to a demand." *Rales*, 634 A.2d at 934.

When the challenged conduct involves one or more business judgments by the board,

however, courts apply the test in *Aronson*.  That test provides that a demand will be excused

as futile if the derivative complaint pleads particularized facts creating a reasonable doubt

that: "(1) the directors are disinterested and independent and (2) the challenged transaction

was otherwise the product of a valid exercise of business judgment." *Aronson*, 473 A.2d at

814.

Here, the parties agree that the *Rales* test must be applied to plaintiffs' accounting-

related claims because the underlying challenged conduct did *not* stem from any affirmative

action by the Board.  Similarly, the parties agree that the Court must apply the *Aronson* test

to the compensation-related claims because plaintiffs, in essence, challenge the Board's

affirmative business judgments of approving contracts and accepting Raines' retirement and

Howard's resignation.  For the following reasons, plaintiffs fail to create the reasonable

doubt necessary to succeed in the application of either test.

### A.  Accounting Related Claims

First, plaintiffs allege that a demand upon the Board to bring a suit regarding the various accounting related claims would have been futile because the Board was incapable of making an independent and disinterested decision to bring this suit.  Plaintiffs claim that the Amended Complaint sets forth five circumstances that allegedly disabled the majority of the Board members from fairly assessing any pre-suit demand.  In particular, plaintiffs allege that a majority of the members of the Board:  (1) were financially interested in the alleged misconduct; (2) were not independent because they are exposed to liability in connection with the accounting issues; (3) were not disinterested directors because of donations by the Fannie Mae Foundation to organizations with which they are affiliated; (4) had business relationships that rendered them interested; and (5) were somehow controlled by former Chairman and Chief Executive Officer Raines.  (Am. Compl. ¶¶ 78, 79.)

In applying the *Rales* test, the Court must "determine whether or not the particularized factual allegations . . . create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales*, 634 A.2d at 934.  Specifically, demand will only be excused based upon futility if a majority of the Board of Directors (*i.e.* seven of the thirteen) was either:  (1) "interested," meaning that their loyalty was divided or that they would receive a benefit from the accounting treatment that other shareholders would not; or

(2) not "independent," that is, controlled by someone else.   *See, e.g.*, *id.* at 936.   For the following reasons, plaintiffs have not established the necessary reasonable doubt as to either.

### 1. Directorial Interest

A director is considered interested "where he or she will receive a personal benefit from a transaction that is not equally shared by the stockholders." *Rales*, 634 A.2d at 936. Directorial interest also exists "where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Id.*  In such a case, "a director cannot be expected to exercise his or her independent judgment without being influenced by the . . . personal consequences resulting from the decision." *Id.*  In this case, plaintiffs argue that the Board is interested because a majority of the directors are financially interested in the alleged accounting misconduct or because they face a substantial likelihood of personal liability for abdicating their oversight duties to the company.  After examining those specific facts that plaintiffs contend are related to the interest of the Board, this Court finds that plaintiffs have failed to create the reasonable doubt necessary that a majority of the Board was either financially or otherwise so interested in the accounting-related issues here that they could not have acted properly in responding to a demand.

### i. Financial Interest in the Challenged Accounting Decisions

Plaintiffs' allegations are insufficient to meet the requirement of demonstrating that a majority (*i.e.* seven or more) of the Board members had a personal financial interest in Fannie Mae's misapplication of GAAP.  The only directors whom plaintiffs identify as

having any financial interest in the accounting transactions are the corporate officer directors (*i.e.* Raines, Howard and Mudd), who essentially concede the same because their compensation was tied to Fannie Mae's financial results. (Directors' Mot. Dismiss at 14 n.9.) The Amended Complaint merely alleges that the entire Board is disabled by self-interest because each member receives directors' fees. (Am. Compl. ¶ 108.) However, because plaintiffs do not allege that the fees these directors received were inherently unreasonable, these allegations *alone* are not enough to create a reasonable doubt of director independence. *In re The Limited, Inc. S'holders Litig.*, No. 17148-NC, 2002 WL 537692, at *4 (Del. Ch. Mar. 27, 2002) (holding that "[a]llegations as to one's position as a director and the receipt of director's fees, without more . . . are not enough for purposes of pleading demand futility"); *Landy v. D'Alessandro*, 316 F. Supp. 2d 49, 71-72 (D. Mass. 2004) (finding that where cases "challenge a transaction unrelated to directors' fees . . . the mere allegation that directors' fees exist does not create interest") (citing *In re Nat'l Auto Credit, Inc. S'holder Litig.*, No. Civ. A. 19028, 2003 WL 139768, at *13 (Del. Ch. Jan. 10, 2003)).

### ii.  *Substantial Likelihood of Personal Liability*

Plaintiffs next argue that a majority of the directors lack independence because of a substantial likelihood of personal liability for accounting violations. (Pls.' Opp. at 19-39.) This argument is unavailing in this case, especially as it applies to the outside directors.

Under Delaware law, "only a sustained or systematic failure of the board to exercise oversight . . . will establish the lack of good faith that is a necessary condition to liability."

*In re Caremark Int'l*, 698 A.2d 959, 971 (Del. Ch. 1996). Indeed, Delaware courts have held

that "the 'mere threat' of personal liability does not constitute a disabling interest for a

director considering a derivative plaintiff's demand." *Rattner v. Bidzos*, No. 19700, 2003

WL 22284323, at *9 (Del. Ch. Sept. 30, 2003); *see also Rales*, 634 A.2d at 936. Rather, a

director is deemed too interested to consider a demand only in "egregious circumstances"

where a plaintiff pleads specific facts establishing a "substantial likelihood" of liability.

*Rattner*, 2003 WL 22284323, at *9. Moreover, a claim like the one here for failure to

exercise proper oversight is one of, if not the most, difficult theories upon which to prevail.

*In re Caremark Int'l*, 698 A.2d at 967; *David B. Shaev Profit Sharing Account v. Armstrong*,

No. 1449-N, 2006 WL 391931, at *5 (Del. Ch. Feb. 13, 2006), *aff'd by* No. 110-2006, 2006

WL 3190507 (Del. Nov. 6, 2006) ("Satisfying the plaintiff's burden in a *Caremark* case is

a difficult task.").

    Indeed, to state a claim for breach of the duty of oversight, a plaintiff must show that

the directors either knew or should have known that violations of the law were occurring, that

they took *no* steps in a good faith effort to prevent or remedy that situation, and that such

failure resulted in plaintiff's losses. *In re Caremark Int'l*, 698 A.2d at 971.[6] Moreover, the

Delaware Supreme Court recently affirmed the *Caremark* standard by upholding a dismissal

---

[6] Plaintiffs assert that this Court should apply the standard used by the Seventh Circuit in *In re Abbott Labs. Deriv. Shareholder Litig.*, 325 F.3d 795, 803 (7th Cir. 2001). However, because the Seventh Circuit applied Illinois state law, that case is not applicable here where Delaware law controls.

of a derivative complaint similar to plaintiffs' complaint in *Stone v. Ritter*, 911 A.2d 362 (Del. 2006).

In the *Stone* case, shareholders filed a purported derivative suit against the directors of AmSouth Bancorporation after the company was assessed criminal fines and civil penalties for failing to file suspicious activity reports as required under federal banking law. Notably, bank regulators later found that the company's compliance program "lacked adequate board and management oversight." *Id.* at 366. Yet, in upholding the dismissal of the purported derivative complaint, the court explained that the *Caremark* standard requires that to establish director oversight liability, the directors must "utterly fail to implement any reporting or information system of controls, or . . . having implemented such a system or controls, consciously fail to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Id.* at 370 (citation omitted).

In this case, plaintiffs' allegations do not approach the level of corporate irresponsibility defined by the Delaware Supreme Court in *Stone*. First, plaintiffs' allegations are insufficient to demonstrate that the outside directors failed to implement a system of controls. To the contrary, the Amended Complaint itself alleges that a control system existed and that the outside directors regularly met with financial management and Fannie Mae's outside auditors to receive reports. (*See* Directors' Supp. Mot. Dismiss at 16-17 (citing numerous paragraphs of Am. Compl.).)

16

Second, the allegations do not support a reasonable inference that the outside directors "consciously failed to monitor or oversee [the] operations" of such a system of oversight. *See Stone*, 911 A.2d at 370. Indeed, plaintiffs' own allegations demonstrate that the directors actually *responded* to each of the "red flags" cited by plaintiffs. First, the Amended Complaint demonstrates that the directors and the Audit Committee met and discussed any audit differences with management and KPMG, who then issued "unqualified opinions" as to their legitimacy. (*See, e.g.*, Am. Compl. ¶¶ 30, 171, 215.) Second, the issues raised by Roger Barnes, a Fannie Mae accounting employee, were raised during an internal meeting that was attended by Barnes and KPMG, and during an Audit Committee meeting attended by KPMG, the company's controller, general counsel, and head of internal audit all reported to the directors that the issues raised by Barnes had been investigated and resolved. ( *See, e.g.*, *id.* ¶¶ 369-70.) Third, the issues related to hedge accounting were discussed with management and KPMG, and KPMG reported to the audit committee that the auditing firm would pay attention to the company's hedge accounting and compliance with FAS 133. (*See, e.g.*, *id.* ¶¶ 255-56.) Finally, plaintiffs' allegations demonstrate that the Board, or its Audit Committee, heard reports about the Freddie Mac issues from the company's financial management team on numerous occasions. And, moreover, there is no indication that those reports provided a basis for the outside directors to question Fannie Mae's accounting practices at that time. (*See, e.g.*, *id.* ¶¶ 336, 346, 348-50.)

Therefore, plaintiffs have failed to plead specific facts which, if true, establish a "substantial likelihood" of personal liability for a breach of oversight duty by a majority of the Board of Directors. The Court, thus, must conclude that a majority of the Board was not so interested that it could not fairly consider a shareholder demand under these circumstances.

### 2. Directorial Independence

A director is independent if his or her "decision is based on the corporate merits . . . before the board rather than extraneous considerations or influences." *Aronson*, 473 A.2d at 816. A director can be shown to lack independence when a plaintiff pleads facts that establish "that the directors are 'beholden' to [the controlling person] or so under their influence that their discretion would be sterilized." *Rales*, 634 A.2d at 936. Here, plaintiffs contend that a majority of the Board lacks independence because of various personal and professional relationships. In particular, the Amended Complaint cites the following three circumstances that allegedly demonstrate that Fannie Mae's directors were lacking the independence necessary to fairly consider a pre-suit demand: (1) charitable grants made by the Fannie Mae Foundation to entities with which some Fannie Mae directors are affiliated (*e.g.*, Howard University and the Kennedy Center); (2) purported business relationships that directors or their family members maintained with Fannie Mae; and (3) Raines' alleged control over the outside directors. (Am. Compl. ¶¶ 107, 119, 120, 129, 136.) For the following reasons, the Court disagrees with the plaintiffs' assertions regarding these

18

circumstances and concludes that the plaintiffs have failed to create the necessary reasonable doubt that a majority of the Board lacked the requisite independence.

### i. Charitable Contributions

First, plaintiffs allege that directors Duberstein, Gerrity, Malek, Marron, Swygert, and Korologos are "beholden to" Mr. Raines because the Fannie Mae Foundation made charitable grants to non-profit organizations with which these individuals were affiliated. (Am. Compl. ¶¶ 120, 135.) How so?

The Fannie Mae Foundation is funded by Fannie Mae, but is itself a separate, independent, non-profit corporation run by individuals not involved with the circumstances alleged in the Amended Complaint except for Raines who served as the Chairman of its Board. (*See* Fannie Mae Foundation, at http://www.fanniemaefoundation.org (last visited May 31, 2007); Am. Compl. ¶ 120.) More importantly, however, plaintiffs do not allege that Raines in any way controlled, unilaterally or substantially, the Foundation's grant-making process. (Pls.' Opp. at 32.)[7] Absent such allegations, the Foundation's grants do not raise a reasonable doubt about the independence of the relevant directors. *See Orman v. Cullman*, 794 A.2d 5, 25 n.50 (Del. Ch. 2002) (a director's independence may not be questioned absent a showing that another director possessed "the unilateral power . . . to decide whether the

---

[7] Plaintiffs only allege that Mr. Raines' "control over the Foundation's grants [is evidenced by] the fact that '[t]he Foundation, when chaired by Raines, poured millions of dollars in grants into organizations in which other members of Fannie Mae's Board held senior positions.'" (Pls.' Opp. at 32 n.22 (citation omitted).) Yet, plaintiffs provide no specific allegations concerning Mr. Raines' involvement in any particular grant, or in the grant-making process in general.

challenged director continues to receive a benefit, financial or otherwise, upon which the challenged director is . . . dependent or is of [a] subjective material importance").

Moreover, plaintiffs have failed to meet their burden of alleging that these grants were material to either the organizations or directors at issue. (*See* Pls.' Opp. at 33 n.24.) *See, e.g.*, *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 822-23 (Del. Ch. 2005) (finding that allegations that the corporation donated money to museums of which two directors were trustees, but made "no mention of any potential influence" that the corporation's contributions had on the directors or the percentage of the museum's overall contributions that came from the corporation were insufficient); *In re Walt Disney Co. Derivative Litig.*, 731 A.2d 342, 359 (Del. Ch. 1998) (finding that a director's independence was not in doubt even where he was the president of a university that had received $1 million from the chairman of the company because the director and chairman did not have political and financial dealings), *aff'd in part, rev'd in part on other grounds*, *Brehm*, 746 A.2d 244. Indeed, considering the relatively small amount of the vast majority of these grants, which were made over a number of years on an *ad hoc* basis, there is no reason to believe that these directors were either dependent upon them or that the grants were of such a material value to the non-profit organizations as to call into question the directors' independence.

### *ii. Business and Professional Relationships*

Second, plaintiffs' allegations that various directors have "business relationships amongst themselves, or with Mr. Raines or Fannie Mae, that make them incapable of

20

independently considering the merits of a demand free from extraneous considerations that cloud their judgment" is equally unavailing. (*See* Pls.' Opp. at 34.) Under Delaware law, to determine whether social and business ties compromise director independence, the court must review the complaint to assess "whether it states with particularity facts indicating that a relationship . . . is so close that the director's independence may *reasonably* be doubted." *Beam v. Stewart*, 845 A.2d 1040, 1051 (Del. 2004) (emphasis in original). This doubt may arise "because of financial ties, familial affinity, a particularly close or intimate personal or business affinity or because of evidence that in the past the relationship caused the director to act non-independent vis-a-vis an interested director." *Id.* Accordingly, because of this high standard, courts routinely reject "[a]llegations of . . . a mere outside business relationship, standing alone, . . . [as] insufficient to raise a reasonable doubt about a director's independence." *Id.* at 1050; *see Highland Legacy Ltd. v. Singer*, No. 1556-N, 2006 WL 741939, at *5 (Del. Ch. Mar. 7, 2006) (holding that plaintiff did not allege facts sufficient to support a claim of non-independence to excuse demand because "the naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence") (quoting *Orman*, 794 A.2d at 27); *Jacobs v. Yang*, No. 206-N, 2004 WL 1728521, at *5-6 (Del. Ch. Aug. 2, 2004).

Here, plaintiffs' allegations are so insignificant that they are set out in detail in a footnote of their Memorandum in Opposition to Defendants' Motions to Dismiss for Failure to State a Claim. Nevertheless, they conclude that these relationships make the directors

21

"incapable of independently considering the merits of demand." (*See* Pls.' Opp. at 34-35 n.25.) Yet, upon closer inspection, plaintiffs' allegations boil down to nothing more than a claim that various directors were involved in corporate-level relationships that did not depend on the individuals involved, and many of which plaintiffs do not allege existed at the time of the filing of the original complaint in this case.[8] Since it is well established that merely alleging that several directors work together outside the company and/or serve together on a few boards of unaffiliated companies, claiming such is not enough to raise a reasonable doubt about a director's independence; especially where, as here, the directors are individuals whose considerable professional accomplishments had been independently achieved well in advance of their election to the Board. *Beam*, 845 A.2d at 1050; *see Litt v. Wycoff*, No. 19083 NC, 2003 WL 1794724, at *4 (Del. Ch. Mar. 28, 2003) ("Neither mere personal friendship alone, nor mere outside business relationships alone, are sufficient to raise a reasonable doubt regarding a director's independence."); *Stein v. Orloff*, No. 7276, 1985 WL 11561, at *4 (Del. Ch. May 30, 1985) (allegations of "extensive business relationships" were

---

[8] Moreover, the Amended Complaint fails to allege that Fannie Mae's relationships with the relevant outside companies were in any way material to any of these entities or to those directors individually. *See, e.g., In re Walt Disney Co.*, 731 A.2d at 360 (allegations of conflict based on fees paid to law firm where "[p]laintiffs have not alleged that the $50,000 in consulting fees was even material to [the director], a nationally known legal and political figure" and were insufficient to raise a reasonable doubt as to director's independence); *In re The Limited, Inc. S'holders Litig.*, No. Civ. A. 17 148-C, 2002 WL 537692, at *5 (Del. Ch. Mar. 27, 2002) (a director who was also a principal in a music company that received $400,000 in compensation from the defendant company did not lack independence because there were no allegations suggesting that the $400,000 annual revenue was material to the music company, let alone to the director himself.).

insufficient to excuse the failure to make a demand because "[n]o facts are alleged which suggest that the directors would not have retained their other positions unless they acted in accordance with [the interested director's] wishes.") Accordingly, these alleged business relationships, as plaintiffs have plead them, do not create a reasonable doubt of director independence.

### iii. Control of Directors by Raines

Finally, plaintiffs allege that certain directors lacked independence because former Chairman and Chief Executive Officer Raines "controlled" those directors. (Am. Compl. ¶ 146.) Specifically, plaintiffs base their allegations of director subservience on the grounds that the Board "never presented any genuine opposition to any proposal or course of conduct advocated by Raines, agreeing at virtually every turn to his suggestions and demands," including approving the compensation arrangements of Raines, Howard, and Mudd, accepting Raines' retirement and Howard's resignation, and causing or permitting the alleged accounting errors that resulted in a restatement of Fannie Mae's financial results. (*Id.*) Unfortunately for plaintiffs, such allegations are not quite enough.

Under Delaware law, to claim that the directors lack independence based upon an allegiance to a dominating director, they must plead *specific* facts sufficient to support a sense of "owingness," namely, a sense of feeling beholden, on the part of the other directors to undermine their independence. *In re the Limited S'holders Litig.*, 2002 WL 537692, at * 27. Moreover, a derivative complaint that is premised on futility due to a dominating officer

or director must plead "particularized facts manifesting a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling." *Aronson*, 473 A.2d at 816 (citation and internal quotation marks omitted). Here, however, plaintiffs present merely conclusory and unsubstantiated allegations of domination that are insufficient to render the Board non-independent. *See, e.g., Aronson*, 473 A.2d at 816 ("The shorthand shibboleth of 'dominated and controlled directors' is insufficient" to establish that a majority of directors lacked independence.); *see also Litt*, 2003 WL 1794724, at *3 ("A director is considered 'independent' unless the complaint alleges particularized facts to show that the director is unable to base his or her decisions on the corporate merits of the issue before the board.").

Moreover, the Court also agrees with defendants that the Board's quick response to OFHEO's interim report undermines the reasonable doubt the plaintiff seeks to establish, namely, that a demand here would have been futile on the accounting-related claims. Indeed, shortly after the report was issued, the Board entered into the first in a series of agreements with OFHEO and took measures addressing the company's accounting policies, capitalization, organization and staffing, compensation, governance and internal controls. (*See* sources cited in Directors' Mot. Dismiss at 26-27.)  In addition, the Board permitted its Special Review Committee to investigate the allegations in the OFHEO Report and retained Senator Warren Rudman and his law firm of Paul Weiss to conduct a lengthy investigation. Notably, when Senator Rudman presented his findings to the Special Review Committee in

an over 600 page report, he found that the Board operated in a manner *consistent* with its fiduciary duties. (*See* Report to the Special Review Committee of the Board of Directors of Fannie Mae, Feb. 23, 2006, at 401 (attached as Ex. 16 to Stern Decl.).)   Accordingly, plaintiffs' allegations of director dominance by former Chairman and Chief Executive Officer Raines do not rise to the level of establishing the requisite reasonable doubt as to their independence.

### B. Senior Executives' Compensation Claims

In the Amended Complaint, plaintiffs further allege that the Board violated its fiduciary duties and wasted Fannie Mae's assets when the Board agreed to amend the employment contracts for Raines, Howard, and Mudd in June 2004 and when the Board accepted Raines' retirement and Howard's resignation on December 21, 2004. (Am. Compl. ¶¶ 93, 465.)   The parties agree that because these compensation-related claims relate to affirmative decisions made by the Board, the two-prong *Aronson* test established by the Delaware Supreme Court applies.   After a review of plaintiffs' allegations in the Amended Complaint, the Court finds, for the following reasons, that plaintiffs' executive compensation-related claims fail to satisfy either prong of the *Aronson* test.

Under the first prong of the *Aronson* test, the Amended Complaint must plead specific facts to show that a majority of the Board is "incapable, due to personal interest or domination and control, of objectively evaluating a demand."   *Brehm*, 746 A.2d at 257. However, as discussed above, plaintiffs have failed to demonstrate that a majority of the

directors could not fairly evaluate a demand upon them because of interest or lack of independence.[9] (*See supra* Section III.A.)

Further, under the second prong of *Aronson*, the Amended Complaint must raise reasonable doubt about whether the challenged transaction is entitled to the protection of the business judgment rule, that provides a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson*, 473 A.2d at 812. To rebut this presumption, plaintiffs must present "particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision." *In re Walt Disney Co. Derivative Litig.*, 825 A.2d at 286. They have not done so here.

The Amended Complaint pleads no specific facts to suggest that the Board either acted in bad faith or without being adequately informed. To the contrary, the Court agrees with defendants that the fact that compensation for the officers of Fannie Mae was

---

[9] The directors do not face a substantial likelihood of liability based upon the executives' compensation claims. First, as the Court finds in this section, the decisions were valid exercises of business judgment. Second, the Board is protected by the safe harbor provision of Section 141(e) of the Delaware General Corporation Law because the Board and the Compensation Committee relied in good faith on expert compensation consultants in reaching these compensation decisions. 8 Del. C. § 141(e). Finally, the allegations of the Amended Complaint are, at most, duty of care violations; yet, Fannie Mae's Bylaw 4.18, an exculpatory provision invoking the Delaware General Corporation Law § 102(b)(7), protects defendants from personal liability for purported duty-of-care violations.

constrained by statute, 12 U.S.C. § 1723a(d)(2),[10] and was reported annually to Congress,[11] is evidence that the directors' compensation decisions were reasonable and made in good faith. Moreover, in setting compensation, the Board's reliance on the expertise and executive compensation data of two separate outside compensation consulting firms, Semler Brossy (an independent consulting firm retained by the Compensation Committee), and Johnson Associates (an independent consulting firm retained by the full Board), undermines any allegations by plaintiffs that the Board was inadequately informed in making its decisions. (*See* Am. Compl. ¶ 400; Fannie Mae Proxy Statement, Apr. 23, 2004 at 18-19 (attached as Ex. 12 to Stern Decl.).) Finally, plaintiffs' allegations are undercut further by Fannie Mae's submission of the compensation agreements at issue to OFHEO for OFHEO's review and preapproval of the termination benefits. (Fannie Mae, Form 8-K (Dec. 27, 2004) at 1.02 (attached as Ex. 7 to Stern Decl.).) Plaintiffs' allegations that the Compensation Committee allowed management to script its meetings, (Am. Compl. ¶ 192), and that the Compensation Committee allowed Raines to choose the Committee's compensation consultant and edit the Compensation Committee's annual report to shareholders, (Am. Compl. ¶ 195), is simply not enough to counter-balance these unrelated facts.

---

[10] Fannie Mae's Charter Act requires compensation for officers be limited to that which "the board of directors determines [to be] reasonable and comparable with compensation for employment in other similar businesses (including other publicly held financial institutions or major financial services companies) involving similar duties and responsibilities." (Fannie Mae Charter Act, 12 U.S.C. § 1723a(d)(2).)

[11] See 12 U.S.C. §§ 1452(h)(1)(A)-(C); 1723a(d)(3)(A).

Moreover, even if these facts are assumed to be true, this case is a far cry from the factual situation in the *Disney* case that plaintiffs rely heavily on, and in which the court found that there was reasonable doubt as to whether the board was entitled to the presumption of the business judgment rule. 825 A.2d at 279-85. In that case, the CEO acted unilaterally; the compensation committee received only an incomplete summary of the employment agreement; the board did not retain an expert; and the board was not fully consulted with in regard to the non-fault termination. In making its decision in *Disney*, that court concluded that plaintiffs' allegations, "if true, imply that the defendant directors *knew* that they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss." *Id.* at 289 (emphasis in original).

By contrast, in light of the Fannie Mae Board's attention and care in reaching the compensation decisions in this case, this Court concludes that plaintiffs have not met their burden of raising a reasonable doubt that the Board is not entitled to the benefit of the presumption that in making a business decision the directors acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. *See, e.g., Brehm,* 746 A.2d at 267 (affirming dismissal of the plaintiffs' derivative claim despite the "extraordinarily lucrative compensation agreement and termination payout awarded a company president who served for only a little over a year and who underperformed"). Accordingly, the Amended Complaint does not plead facts sufficient

either to overcome the presumption of the business judgment rule or support plaintiffs'

conclusion that a demand would have been futile as to the compensation-related claims.  In

the absence of such specific facts, plaintiffs cannot, in effect, substitute their judgment for the

Board's through the use of a shareholder derivative cause of action.

## CONCLUSION

Thus, for all of the foregoing reasons, this Court GRANTS defendants' Motions to Dismiss

plaintiffs' claims against it.[12]  An appropriate Order consistent with this ruling accompanies this

Memorandum Opinion.

RICHARD J. LEON
**United States District Judge**

---

[12]  Pursuant to Federal Rule of Evidence 201, a court may take judicial notice of "a fact not subject to reasonable dispute in that it is either:  (1) generally known within the territorial jurisdiction of the trial court; or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Each of the exhibits submitted by the defendants that were attached to the Declaration of Robert M. Stern in Support of Defendant Fannie Mae's Request for Judicial Notice and Appendix of Authorities meets this standard, and, therefore, will be judicially noticed by this Court.