# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued April 23, 2008          Decided August 8, 2008

No. 07-7108

PIRELLI ARMSTRONG TIRE CORPORATION RETIREE MEDICAL
BENEFITS TRUST, DERIVATIVELY ON BEHALF OF FEDERAL
NATIONAL MORTGAGE ASSOCIATION AND WAYNE COUNTY
EMPLOYEES' RETIREMENT SYSTEM, DERIVATIVELY ON BEHALF
OF FEDERAL NATIONAL MORTGAGE ASSOCIATION
APPELLANTS

v.

FRANKLIN D. RAINES, ET AL.,
APPELLEES

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED   AUG   8 2008

CLERK

Appeal from the United States District Court
for the District of Columbia
(No. 04cv01783)

*Randall J. Baron* argued the cause for appellants. With
him on the briefs were *Eric A. Isaacson* and *Benny C.
Goodman III.*

*Maureen E. Mahoney* argued the cause for appellees.
With her on the briefs were *Everett C. Johnson, Jr., J. Scott
Ballenger, Jeffrey W. Kilduff, Michael J. Walsh, Jr., Barbara
_____ Wareham, James E. Anklam, John J.*

RECEIVED

FEB 13 2009

Clerk, U.S. District and
_____ otcy Courts

2

*Clarke, Jr., Earl J. Silbert, James Hamilton, Rhonda D. Orin, Daniel J. Healy, William K. Dodds, Stephanie A. Joyce, Glenn B. Manishin, David E. Barry, William A. Krohley, Christopher C. Palermo, Steven M. Salky, Eric Delinsky, Holly A. Pal, Kevin M. Downey*, and *Paul Mogin. Barbara A. Miller* entered an appearance.

Before: TATEL, BROWN, and KAVANAUGH *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* KAVANAUGH, in which *Circuit Judge* TATEL joins.

Opinion concurring in the judgment filed by *Circuit Judge* BROWN.

KAVANAUGH, *Circuit Judge*: In 2004, Fannie Mae announced one of the largest corporate earnings restatements in U.S. history. Numerous investigations and official reports followed. The story of Fannie Mae told by these reports is disturbing. It thus comes as no surprise that the Fannie Mae accounting debacle has generated a wave of lawsuits. In this case, certain Fannie Mae shareholders filed a derivative suit on behalf of Fannie Mae against the Company's directors. The complaint targets the directors' failure to prevent the accounting irregularities. The complaint also challenges the directors' decision to approve severance arrangements for two Fannie Mae officers, Franklin D. Raines and J. Timothy Howard.

The parties agree that Delaware law provides the substantive standards for evaluating plaintiffs' complaint. Shareholders ordinarily must make a demand on the company's board of directors in order to bring a derivative suit. Although these shareholders did not make such a demand, the law does not require demand when it would be

3

futile. But consistent with the long-standing principle that directors and not shareholders manage a corporation, the Delaware precedents on demand futility make clear that the bar is high, the standards are stringent, and the situations where demand will be excused are rare.

Carefully applying the Delaware precedents, the District Court found that plaintiffs' complaint failed to meet the test for demand futility and dismissed the case. We affirm.

I

Fannie Mae is a federally chartered corporation authorized by Congress in 1934 and created in 1938. Initially established as a public entity, Fannie Mae was privatized in 1968. Fannie Mae thus has shareholders, directors, and officers like other non-governmental corporations.

Fannie Mae's mission is to increase affordable housing for moderate- and low-income families. It purchases mortgages originated by other lenders and helps lenders convert their home loans into mortgage-backed securities. The goal is to provide stability and liquidity to the mortgage market. This allows mortgage lenders to provide more loans, thereby increasing the rate of homeownership in America.

During the summer of 2003, Fannie Mae's sister organization Freddie Mac disclosed accounting irregularities. Shortly thereafter, the Office of Federal Housing Enterprise Oversight, an Executive Branch agency, reviewed Fannie Mae's accounting. In September 2004, OFHEO released an interim report that highlighted deficiencies in Fannie Mae's accounting policies, internal controls, and financial reporting. OFHEO's interim report led to an investigation by the Securities and Exchange Commission. On December 15,

2004, the SEC announced that it would require a $9 billion earnings restatement by Fannie Mae.

Six days after the SEC's announcement, two Fannie Mae officers (CEO Franklin D. Raines and CFO J. Timothy Howard) resigned. The Board did not fire Raines or Howard for cause; as a result, they were able to leave the company with approximately $31 million in severance benefits.

In late 2004, shareholders filed multiple derivative suits on behalf of Fannie Mae against Fannie Mae's directors. *See In re Fed. Nat'l Mortgage Ass'n Litig.*, 503 F. Supp. 2d 9, 13 (D.D.C. 2007). As relevant here, plaintiffs allege that Fannie Mae's Board of Directors failed to exercise sufficient oversight to prevent the accounting violations. Plaintiffs also contend that the outside directors on the Board should have (i) terminated Raines and Howard for cause, thereby denying them severance benefits, and (ii) sued to obtain disgorgement of previous compensation Raines and Howard received.

Shareholders bringing a derivative suit first must make a demand on the Board, in effect asking the Board to have the corporation pursue the claims itself. The shareholders here did not do so. They assert that demand is excused in this case because a majority of the directors could not render a disinterested and independent decision whether to pursue those claims.[1] The District Court found that demand was not excused and dismissed the suit.[2]

---

[1] The parties have agreed throughout the litigation that Delaware law applies to the analysis in this case of the demand requirement and the directors' potential liability. That is because the relevant Fannie Mae statute and regulation have been applied so as to incorporate Delaware General Corporation Law. *See* 12 U.S.C. § 4513; 12 C.F.R. § 1710.10(b); Fannie Mae ByLaws,

5

## II

Before turning to the merits of this appeal, we address jurisdiction.  The parties all agree there is federal subject-matter jurisdiction based on 12 U.S.C. § 1723a(a), which authorizes Fannie Mae to "sue and to be sued, and to complain and to defend, in any court of competent jurisdiction, State or Federal."  Based on an independent assessment, we also conclude that this provision establishes federal subject-matter jurisdiction.

In *American National Red Cross v. S.G.*, the Supreme Court considered a statute providing that the Red Cross could "'sue and be sued in courts of law and equity, State or Federal, within the jurisdiction of the United States.'"  505 U.S. 247, 248 (1992) (quoting 36 U.S.C. § 2 (now codified as amended at 36 U.S.C. § 300105(a)(5))).  The Court held that

---

Corporate Governance Practices & Procedures, Art. 1, § 1.05, http://www.fanniemae.com/governance/pdf/bylaws.pdf.

[2]  Under *Gaubert v. Federal Home Loan Bank Board*, we review the District Court's decision for abuse of discretion.  863 F.2d 59, 68 n.10 (D.C. Cir. 1988).  We tend to agree with plaintiffs that an abuse-of-discretion standard may not be logical in this kind of case, however, because the question whether demand is excused turns on the sufficiency of the complaint's allegations; and the legal sufficiency of a complaint's allegations is a question of law we typically review de novo.  But there is no need to further consider this aspect of *Gaubert* at this time because we affirm the District Court's decision even under de novo review.

Relatedly, plaintiffs argue that that the District Court abused its discretion by relying on extraneous public reports and similar materials in evaluating the sufficiency of the complaint.  The District Court's mention of those public materials did not affect its resolution of the case.  In any event, those materials are not relevant to a de novo assessment of the complaint.

6

this sue-and-be-sued clause conferred federal subject-matter jurisdiction over cases in which the Red Cross was a party. *Red Cross*, 505 U.S. at 257. In so ruling, the Court articulated the general principle that "a congressional charter's 'sue and be sued' provision may be read to confer federal court jurisdiction if, but only if, it *specifically mentions the federal courts.*" *Id.* at 255 (emphasis added). The *Red Cross* Court stated that express reference to federal courts in a federally chartered entity's sue-and-be-sued clause was "necessary *and sufficient* to confer jurisdiction." *Id.* at 252 (emphasis added).

The *Red Cross* majority repeatedly characterized this principle as a "rule," *see id.* at 255-57, noting that it had been "established" in the early 19th Century by *Osborn v. Bank of United States*, 22 U.S. (9 Wheat.) 738, 818 (1824), and subsequently confirmed in *Bankers Trust Co. v. Texas & Pacific Railway Co.*, 241 U.S. 295, 304 (1916), and *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 455-56 (1942). And the *Red Cross* dissenters similarly understood the rule's clarity, although they disagreed with the rule's content: "The Court today concludes that whenever a statute granting a federally chartered corporation the 'power to sue and be sued' specifically mentions the federal courts (as opposed to merely embracing them within general language), the law will be deemed . . . to confer on federal district courts jurisdiction over any and all controversies to which that corporation is a party." 505 U.S. at 265 (Scalia, J., dissenting) (emphasis omitted).

Applying the *Red Cross* rule to the present case, we find that there is federal jurisdiction because the Fannie Mae "sue and be sued" provision expressly refers to the federal courts in a manner similar to the Red Cross statute. To be sure, the Fannie Mae sue-and-be-sued clause differs from the Red Cross statute in one respect: It refers to "any court of

7

competent jurisdiction, State or Federal," whereas the Red Cross statute refers to "courts of law and equity, State or Federal." *Compare* 12 U.S.C. § 1723a(a), *with* 36 U.S.C. § 300105(a)(5). We agree, however, with the majority of district courts that have confronted the question since *Red Cross*: Section 1723a(a) provides federal subject-matter jurisdiction in Fannie Mae cases. *See, e.g., Grun v. Countrywide Home Loans, Inc.*, 2004 WL 1509088, at *2 (W.D. Tex. July 1, 2004); *Connelly v. Fed. Nat'l Mortgage Ass'n*, 251 F. Supp. 2d 1071, 1073 (D. Conn. 2003); *C.C. Port, Ltd. v. Davis-Penn Mortgage Co.*, 891 F. Supp. 371, 372 (N.D. Tex. 1994), *aff'd*, 58 F.3d 636 (5th Cir. 1995); *Peoples Mortgage Co. v. Fed. Nat'l Mortgage Ass'n*, 856 F. Supp. 910, 917 (E.D. Pa. 1994).

It is true that two district courts have reached the contrary conclusion, reasoning that applying the *Red Cross* rule to Fannie Mae is problematic because doing so, in their view, renders superfluous the words "of competent jurisdiction" in the Fannie Mae statute. *See Knuckles v. RBMG, Inc.*, 481 F. Supp. 2d 559, 563 (S.D.W.Va. 2007); *Fed. Nat'l Mortgage Ass'n v. Sealed*, 457 F. Supp. 2d 41, 44-46 (D.D.C. 2006). We disagree with the *Knuckles* and *Sealed* district court opinions. Applying the *Red Cross* rule to the Fannie Mae statute does not render the words "of competent jurisdiction" superfluous. The words "of competent jurisdiction" help clarify that: (i) litigants in state courts of limited jurisdiction must satisfy the appropriate jurisdictional requirements, *see Osborn*, 22 U.S. (9 Wheat.) at 817-18 (finding federal jurisdiction because of statute empowering a federal corporation "to sue and be sued . . . *in all state courts having competent jurisdiction, and in any circuit court of the United States*") (internal quotation marks omitted) (emphasis added); (ii) litigants, whether in federal or state court, must establish that court's personal jurisdiction over the parties, *see*

8

*Blackmar v. Guerre*, 342 U.S. 512, 516 (1952) (noting that a "court of 'competent jurisdiction'" for the purpose of hearing suits against civil service commissioners must be one that possessed personal jurisdiction over those commissioners); *see also United States v. Morton*, 467 U.S. 822, 828 (1984); (iii) litigants relying on the "sue-and-be-sued" provision can sue in federal district courts but not necessarily in all federal courts, *see Red Cross*, 505 U.S. at 256 n.8; *id.* at 267 (Scalia, J., dissenting); Brief of Petitioner-Appellant at 30-31, Am. Nat'l Red Cross v. S.G., 505 U.S. 247 (1992) (No. 91-594) ("it is obvious that the district courts are intended" to receive the jurisdiction conferred in "sue-and-be-sued" clauses); and (iv) where the Tucker Act otherwise might funnel cases to the Court of Federal Claims, the federal district courts still possess jurisdiction, *see Ferguson v. Union Nat'l Bank*, 126 F.2d 753, 756 (4th Cir. 1942) (applying "of competent jurisdiction" language in 12 U.S.C. § 1702: "It could hardly have been intended by Congress that suits for over $10,000 against the Administrator could be brought in any state court of general jurisdiction, but in the federal jurisdiction only in the Court of Claims . . . ."). Applying the *Red Cross* rule to the Fannie Mae statute thus does not render the words "of competent jurisdiction" meaningless.[3]

---

[3] When the Supreme Court decided *Red Cross*, it was well aware of the opinion's significance for statutes that included the "of competent jurisdiction" language. Consistent with a position previously advanced by the Solicitor General, the Red Cross identified those "of competent jurisdiction" statutes to the Court and argued that the "of competent jurisdiction" language did not detract from the jurisdictional force of a sue-and-be-sued clause that referred to federal courts. *See* Brief of Petitioner-Appellant at 49, Am. Nat'l Red Cross v. S.G., 505 U.S. 247 (1992) (No. 91-594) (noting that "other entities besides the Red Cross will be affected" and explaining that "[t]he Solicitor General also has advised this

9

The Supreme Court's unanimous decision in *Breuer v. Jim's Concrete of Brevard, Inc.* is consistent with our conclusion. *See* 538 U.S. 691 (2003). There, the Court held that the Fair Labor Standards Act's right-to-sue clause did not bar removal of suits from state to federal court. *Id.* at 694-97; 29 U.S.C. § 216(b). In so holding, the Court stated that there was "no question that Breuer could have begun his action in the District Court" given the language in the FLSA statute – similar to the Fannie Mae statute – indicating that an action "'may be maintained . . . in any Federal or State court *of competent jurisdiction.*'" 538 U.S. at 694 (quoting 29 U.S.C. § 216(b)) (alteration in original) (emphasis added). Therefore, despite the presence of an "of competent jurisdiction" phrase, the Court found no reason to doubt that the FLSA's right-to-sue clause conferred federal jurisdiction.

Judge Brown's separate opinion appears to acknowledge that the original Fannie Mae sue-and-be-sued clause in place from 1934 to 1954 conferred automatic federal jurisdiction in Fannie Mae cases, but says that Congress eliminated this jurisdictional grant in 1954 by adding the words "of

---

Court: 'Plainly, Section 1702 [of the National Housing Act], by authorizing suit 'in any court of competent jurisdiction, State or Federal,' provides a basis for district court jurisdiction . . . .'") (citing Brief for the Respondents in Opposition at 9, Portsmouth Redevelopment & Housing Auth. v. Pierce, 464 U.S. 960 (1983) (No. 83-90)); *see also* Petition for Writ of Certiorari at 23, S.G. v. Am. Nat'l Red Cross, 938 F.2d 1494 (1st Cir. 1991) (No. 91-594); Brief for the United States as Amicus Curiae Supporting Petitioners at 5-6, Am. Nat'l Red Cross v. S.G., 505 U.S. 247 (No. 91-594) (arguing that the Supreme Court's sue-and-be-sued decisions "have established a clear rule that congressional charters provide for original jurisdiction in the federal courts whenever they specifically grant a right to sue and be sued in federal courts").

10

competent jurisdiction." We disagree. After the 1954 statutory change, the jurisdictional provision of the Fannie Mae statute continues to refer to federal courts, thus still falling within the *Red Cross* rule we are bound to follow. Moreover, we disagree with the separate opinion about the meaning and effect of that 1954 statutory change.

Under the original 1934 statute, Fannie Mae was a governmental entity that could "sue and be sued, complain and defend, in any court of law or equity, State or Federal." Pub. L. No. 73-479, § 301(c)(4), 48 Stat. 1246, 1256 (1934). The Housing Act of 1954 maintained Fannie Mae's governmental status, but completely revamped the 1934 legislation; the addition of the phrase "of competent jurisdiction" to the sue-and-be-sued clause was one of numerous changes. *See* Pub. L. No. 83-560, tit. II, 68 Stat. 590, 612-22 (1954). Unlike Judge Brown, we see no plausible reason that Congress in 1954 would have continued to refer to federal courts in the sue-and-be-sued clause — language understood since the *Osborn* case in 1824 to confer federal jurisdiction in cases involving federally chartered entities — and then used the words "of competent jurisdiction" in an attempt to negate automatic federal jurisdiction. If Congress in 1954 did not want to continue to confer federal jurisdiction in Fannie Mae cases, it logically would have omitted the word "Federal" from the statute, not attempted a bank shot by adding the words "of competent jurisdiction."

This analysis finds support from the fact that in 1954 — the same year that Congress redrafted Fannie Mae's charter — Congress also revised the "sue-and-be-sued" provision of the Federal Savings and Loan Insurance Corporation statute by deleting "Federal" from the original FSLIC law. The FSLIC statute as amended read: "[t]o sue and be sued . . . in any court of competent jurisdiction in the United States." Pub. L.

No. 83-560, § 501(1), 68 Stat. 590, 633 (1954) (amending
Pub. L. No. 73-479, § 402(c)(4), 48 Stat. 1246, 1256 (1934)
("[t]o sue and be sued . . . in any court of law or equity, State
or Federal")). In other words, in 1934 Congress established
two substantially identical "sue-and-be-sued" provisions, one
for Fannie Mae and one for the FSLIC. And in 1954,
Congress dropped the word "Federal" from the FSLIC statute
while keeping the word "Federal" in the Fannie Mae statute.
We must assume that Congress knew the jurisdictional
consequences of what it was doing in 1954. The fact that
Congress chose to keep that all-important word in the Fannie
Mae statute but to delete it from the FSLIC statute is
compelling evidence that Fannie Mae's "sue-and-be-sued"
provision was meant to ensure continuing federal jurisdiction
in Fannie Mae cases.

The separate opinion's analysis of the "of competent
jurisdiction" language also does not account for the
congressional expectations associated with "sue-and-be-sued"
provisions during the middle of the 20th Century when this
statutory change was made. A number of cases relevant to
this issue had been decided in the years before 1954. To
begin with, since 1824, the courts had concluded that express
reference to federal courts in a sue-and-be-sued clause of a
federally chartered entity would ensure federal jurisdiction.
*See Osborn*, 22 U.S. (9 Wheat.) at 818; *cf. Red Cross*, 505
U.S. at 252 (earlier cases placed Congress "on prospective
notice of the language necessary and sufficient to confer
jurisdiction"). In 1952, moreover, the Supreme Court's
decision in *Blackmar v. Guerre* made clear that using the
phrase "of competent jurisdiction" would serve the objective
of requiring a plaintiff to establish personal jurisdiction in
cases involving corporate entities like Fannie Mae. *See
Blackmar*, 342 U.S. at 516. Because of *Blackmar*, Congress
might have thought the textual formula approved in 1942 in

12

*D'Oench, Duhme* – "in any court of law or equity, State or Federal" – did not suffice to require a showing of personal jurisdiction. In addition, as of 1954, Congress would not have thought that using the phrase "of competent jurisdiction" could negate federal jurisdiction in Fannie Mae cases; several recent circuit precedents had interpreted sue-and-be-sued clauses that included the phrase "of competent jurisdiction" and found federal jurisdiction. *See George H. Evans & Co. v. United States*, 169 F.2d 500, 502 (3d Cir. 1948); *Seven Oaks, Inc. v. Fed. Hous. Admin.*, 171 F.2d 947, 948-49 (4th Cir. 1948); *Ferguson v. Union Nat'l Bank*, 126 F.2d 753, 756-57 (4th Cir. 1942). The *Evans* and *Ferguson* cases specifically relied on the "of competent jurisdiction" language, moreover, to hold that federal *district* courts had jurisdiction over cases involving federal entities that otherwise might be considered subject to the Tucker Act and shoehorned into the Court of Claims. Therefore, we think it abundantly clear that Congress in 1954 would not have thought or intended the words "of competent jurisdiction" to negate automatic federal jurisdiction for Fannie Mae cases.[4]

---

[4] Interpreting Fannie Mae's sue-and-be-sued provision as a grant of federal jurisdiction is also consistent with the fact that Fannie Mae's later-created sibling, Freddie Mac, carries a "sue-and-be-sued" provision that, like the Red Cross's, does not include the phrase "of competent jurisdiction." *See* 12 U.S.C. § 1452(c). It is logical to conclude that Congress used distinctive statutory language in the 1954 Fannie Mae statute in response to the precedents of that era. In addition, Freddie Mac – like the Red Cross – was originally created as a private entity, whereas Fannie Mae was a governmental entity until 1968. Therefore, Congress likely would not have been concerned that, absent the "of competent jurisdiction" language, Freddie Mac cases could be funneled only to the Court of Claims rather than to federal district courts, which was a potential concern in 1954 when Congress

13

In sum, in interpreting the Fannie Mae statute, we see no need to muddy the waters by departing from *Red Cross*'s clear rule for interpreting the text of a federally chartered entity's sue-and-be-sued clause.  And even if we were to go beyond that rule in this case, the legislative background to Congress's 1954 statutory amendment strongly supports automatic federal jurisdiction in Fannie Mae cases.  We therefore hold that Fannie Mae's sue-and-be-sued clause confers federal subject-matter jurisdiction.

The jurisdictional issue resolved, we turn to the merits of the complaint.

III

Plaintiffs concede that they did not attempt to make a pre-suit demand on the Board as is ordinarily required for shareholder derivative suits.  Rather, plaintiffs allege that a demand on the Board would have been futile because a majority of the Board was not "disinterested" and "independent."

When plaintiffs filed the relevant complaint, there were 13 directors on Fannie Mae's Board.  This included three corporate officers: then-CEO Franklin D. Raines, then-CFO J. Timothy Howard, and current-CEO Daniel H. Mudd.  It also included 10 outside directors: Stephen B. Ashley, Kenneth M. Duberstein, Thomas P. Gerrity, Ann Korologos, Frederic V. Malek, Donald B. Marron, Anne Mulcahy, Joe K. Pickett, Leslie Rahl, and H. Patrick Swygert.  To prove demand futility, plaintiffs must prove that a majority of the Board at the time of the complaint – here, at least seven directors –

---

revised the Fannie Mae statute for that then-governmental entity. *Cf. Ferguson*, 126 F.2d at 756-57.

14

lacked the necessary disinterestedness and independence to evaluate the suit. For purposes of this appeal only, it is conceded that Raines, Howard, and Mudd were not disinterested and independent. So for demand to be excused, the complaint must create a "reasonable doubt" about the disinterestedness or independence of at least four of the 10 outside directors. *See Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984).

Federal Rule of Civil Procedure 23.1 mandates that a complaint in a shareholder derivative suit "state with particularity . . . the reasons for . . . not making the effort" to make a demand. FED. R. CIV. P. 23.1(b)(3). Plaintiffs state three main reasons to support their argument of demand futility.

*First*, plaintiffs allege that demand is excused on their accounting-related claims. They argue that there was a "reasonable doubt" about the directors' "disinterestedness" to consider a demand because, in plaintiffs' view, there is a "substantial likelihood" that a majority of the directors would be liable on the accounting-related claims for failure to exercise proper oversight. *See Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993) (internal quotation marks omitted).

*Second*, plaintiffs allege that demand is excused on their severance-related claims. They allege that there was a "reasonable doubt" about the Board's "disinterestedness" to consider a demand because, in plaintiffs' view, the directors did not exercise valid "business judgment" in approving the severance arrangements for Raines and Howard. *See Aronson*, 473 A.2d at 815.

*Third*, plaintiffs allege that demand is excused on both sets of claims because there was a "reasonable doubt" about a majority of the Board's "independence" to consider a demand

15

in light of the various professional, charitable, and personal entanglements among Board members. *See Beam v. Stewart*, 845 A.2d 1040, 1049 (Del. 2004).

A

With respect to the accounting-related claims, plaintiffs contend that demand is excused because there was a reasonable doubt about the disinterestedness of a majority of the directors: They claim that a majority of the directors face a "substantial likelihood" of personal liability as a result of their failure to exercise sufficient oversight. *See Rales*, 634 A.2d at 934, 936.

Liability predicated on a Board's failure to exercise oversight "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark Int'l, Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996); *see also Stone v. Ritter*, 911 A.2d 362, 372 (Del. 2006). The standard "requires conduct that is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (i.e., gross negligence)." *Stone*, 911 A.2d at 369. As relevant here, plaintiffs must allege particularized facts demonstrating that the directors "knew that they were not discharging their fiduciary obligations" and failed to act "in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities." *Id.* at 370.

According to plaintiffs, the complaint alleges that the directors crossed that line by failing to adequately respond to several "red flags": (1) a $200 million audit difference originating in 1998; (2) a whistleblower's complaints that Fannie Mae was improperly manipulating earnings; (3) signs that Fannie Mae management was using improper hedge accounting practices; and (4) sister company Freddie Mac's

16

disclosure in 2003 that it had understated profits. Plaintiffs' Br. at 44-55. We disagree that these allegations create a "substantial likelihood" of personal liability for the directors. On each claim, the Board or its relevant committee looked into the matter and relied on internal or external accounting experts and officials responsible for those matters. As the District Court correctly stated, "plaintiffs' own allegations demonstrate that the directors actually responded to each of the 'red flags' cited by plaintiffs." *In re Fed. Nat'l Mortgage Ass'n Litig.*, 503 F. Supp. 2d 9, 19 (D.D.C. 2007) (emphasis omitted). Under Delaware law, a Board of Directors is not a Board of Accountants. Although the allegations (if true) may show negligence by the Board, they do not meet the very high standards set by Delaware law for director oversight liability.

*First*, plaintiffs claim that the directors ignored a $200 million audit difference originating in 1998. Second Am. Comp. at ¶¶ 28-30. That year, Fannie Mae incurred $440 million of expenses on its mortgage holdings. *Id.* at ¶ 28. Instead of adjusting its income by $440 million, Fannie Mae adjusted its income by $240 million and deferred the remaining expenses to subsequent years. *Id.* at ¶ 29. Deferring the expenses and engaging in other manipulative accounting practices enabled Fannie Mae to meet its performance target and thus increased the company executives' incentive-based compensation. *Id.* at ¶¶ 31-32.

Plaintiffs claim that the directors ignored the audit difference. But plaintiffs' own allegations demonstrate that the directors did in fact address the issue. Second Am. Comp. at ¶ 30. The complaint states that the Audit Committee – a standing committee of the Board of Directors – met with KPMG, Fannie Mae's outside auditor, to discuss the audit difference. And KPMG agreed with Fannie Mae's treatment of the expenses. *Id.*

17

Under Delaware law, directors are insulated from liability when they rely in good faith on the opinions of outside experts who are acting within their expertise. *See* DEL. CODE ANN. tit. 8 § 141(e); *Brehm v. Eisner*, 746 A.2d 244, 261-62 (Del. 2000). The complaint shows that the Audit Committee relied on KPMG's opinions with respect to the audit difference, which turned this allegedly red flag into a green flag.

*Second*, according to plaintiffs, the directors ignored whistleblower Roger Barnes's complaints that Fannie Mae was improperly manipulating earnings. Second Am. Comp. at ¶ 98. Barnes was a mid-level accountant; in 2003, he wrote a detailed memorandum to internal auditors regarding what he considered to be improper accounting practices at Fannie Mae. *Id.* at ¶¶ 98, 362. The complaint alleges that the Audit Committee of the Board learned about the memorandum but deliberately dismissed Barnes's revelations, letting them lie without further investigation and permitting the accounting violations to continue.

But again, the complaint shows that the Audit Committee responded. *Id.* at ¶ 365. Shortly after learning of the memo, the Audit Committee, company executives, and KPMG convened to review and discuss Barnes's allegations. *Id.*; OFHEO Final Report, Joint Appendix ("J.A.") 714. At this meeting, the Audit Committee "expressed satisfaction with the results of the review" and commended company officers for working quickly to address the concerns. Second Am. Comp. at ¶ 366 (internal quotation marks omitted).

As explained above, directors are insulated from liability when they rely in good faith on the opinions of outside experts who are acting within their expertise. Directors also are "fully protected in relying in good faith" upon the

18

"opinions, reports or statements presented to the corporation by any of the corporation's officers or employees," so long as the Board "reasonably believes" that such matters are "within such other person's professional or expert competence." DEL. CODE ANN. tit. 8 § 141(e). With respect to the Barnes Memorandum, plaintiffs have not put forth particularized facts undermining the Audit Committee's reliance on officials who were responsible for these issues and who assured the Committee that the situation had been resolved. It is not as if the Audit Committee took the Barnes Memo from the in-box and put it in the out-box without taking any action.

*Third*, plaintiffs allege that the Assets and Liabilities Policy Committee – another standing committee of the Board of Directors – should have known that management was using improper "hedge accounting" practices. According to plaintiffs, Fannie Mae's executives improperly applied "hedge accounting" principles to derivatives, thereby spreading the company's losses on derivatives over a number of years rather than booking them immediately. But the complaint alleges only that the directors should have known about the accounting violations even though KPMG assessed the implementation of this accounting policy. Second Am. Comp. at ¶¶ 256-57, 399. Again, therefore, this allegation does not create a substantial likelihood of personal liability under the standards of Delaware law for director oversight claims.

*Fourth*, plaintiffs assert that the directors failed to sufficiently react after Fannie Mae's sister organization Freddie Mac disclosed in 2003 that it had "understated profits" in an effort to "smooth earnings and maintain its image on Wall Street as a steady performer." Second Am. Comp. at ¶ 343. Plaintiffs allege that the "similarities between Fannie Mae and Freddie Mac and the common issues

19

that were the focus of the Freddie Mac violations should have . . . serve[d] as 'red flags'" alerting the directors to Fannie Mae's financial manipulations. *Id.* at ¶ 346. The problem for plaintiffs is that the Board of Directors responded to the news about Freddie Mac. The directors met multiple times to discuss the Freddie Mac situation. Second Am. Comp. at ¶¶ 344, 345, 347, 348, 349, 351, 353. At those meetings, the company's financial officers contrasted Freddie Mac's practices with Fannie Mae's and assured the Board that Fannie Mae's accounting was sound. *See* OFHEO Final Report, J.A. 766-67. Again, because the outside directors relied on representations of internal financial experts, they are protected against personal liability.

In sum, the complaint fails to establish a substantial likelihood of personal liability for the outside directors on the accounting-related claims. Therefore, under Delaware law, the accounting-related allegations do not create a reasonable doubt about the disinterestedness of the Board to consider a demand with respect to those claims.[5]

B

On the severance-related claims, plaintiffs allege that the directors' decisions to allow Raines and Howard "to resign or

---

[5] To support their claims, plaintiffs rely on the Sixth Circuit's decision applying Delaware law in *McCall v. Scott*, 239 F.3d 808 (6th Cir. 2001), *amended on denial of reh'g*, 250 F.3d 997 (6th Cir. 2001). In that case, the court excused demand in a case where the shareholders' claims arose out of "allegedly wide-spread and systematic health care fraud." *Id.* at 813. Even assuming arguendo that the result in *McCall* is consistent with the high standards set by Delaware law, *McCall* contained far more substantial allegations with respect to lack of proper directorial oversight than are contained in the complaint in this case.

20

retire with more than $31 million in severance benefits" and to absolve the executives of their "legal obligation to disgorge compensation that they had procured via accounting manipulations and insider trading" create a "reasonable doubt" that they were the product of a valid business judgment by the directors.  Plaintiffs' Br. at 29; *Aronson*, 473 A.2d at 814.[6]

The business judgment rule establishes a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson*, 473 A.2d at 812.  As plaintiffs acknowledge, the business judgment rule protects decisions unless "no reasonable business person" would have made the decision.  Plaintiffs' Br. at 41 (internal quotation marks omitted).  Under this principle, courts rarely second-guess directors' compensation and severance decisions because the "size and structure of executive compensation are inherently matters of judgment." *Brehm*, 746 A.2d at 263.  Plaintiffs thus must allege "particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision." *See In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 286 (Del. Ch. 2003) (*Disney II*).

To support their claim that the directors' severance decision was not a valid business judgment, plaintiffs rely on

---

[6] It appears from the complaint that a 14th director, Wulff, was involved in the severance-related decisions, but that does not affect the analysis in this section because the complaint alleges that the severance decision was a collective decision by the outside directors (in other words, on this claim, either all were disinterested or none were disinterested).

the *Disney II* case. There, the Delaware Chancery Court found that the board's decision not to seek a termination based on fault or to inquire into the terms and conditions of the termination agreement was not entitled to the protection of the business judgment rule. *See Disney II*, 825 A.2d at 286-87. As the *Disney II* court described it, the complaint demonstrated that the "defendant directors consciously and intentionally disregarded their responsibilities, adopting a 'we don't care about the risks' attitude concerning a material corporate decision." *Id.* at 289 (emphasis omitted). The court accordingly concluded that plaintiffs sufficiently alleged that the directors breached their "obligation to act honestly and in good faith in the corporation's best interests" and thus their decision "fell outside the protection of the business judgment rule." *Id.*

But plaintiffs here fail to allege particularized facts that demonstrate that the process was similarly flawed or that the directors acted without adequate information or deliberation. The complaint itself acknowledges that the termination decision was made in a *series* of board meetings held over *several days*. Second Am. Comp. at ¶ 414 (termination decision "discussed in Board meetings on December 19, 20 and 21, 2004").

The complaint alleges that the "issue was not discussed by the Compensation Committee, which had no meetings during this timeframe." *Id.* But that is a red herring because the Compensation Committee is a standing committee of the Board of Directors. The individuals who sat on the Compensation Committee also sat on the Board of Directors, and the full Board met at length to discuss the severance issue.

22

Plaintiffs also point to the fact that the directors made the decision without the assistance of any compensation consultants. But that is irrelevant: The question in this case is not about an initial compensation package but instead a judgment about for-cause termination and what kind of severance was best for the short- and long-term interests of the company.

Plaintiffs allege that even if procedurally sound, the severance decision was substantively flawed because Raines's and Howard's fraudulent acts constituted grounds to terminate them for cause. But in the analogous case of *Brehm v. Eisner*, the Supreme Court of Delaware dismissed a similar claim because the complaint failed to allege that the directors did not act within their discretion in awarding an underperforming executive a severance package. 746 A.2d 244 (Del. 2000). The court found two business reasons that could support the directors' decision: First, the company would likely have to litigate any dispute over the reasons for termination and "persuade a trier of fact and law" that the decision was warranted under the contract. *Id.* at 265. Second, "that process of persuasion could involve expensive litigation, distraction of executive time and company resources, lost opportunity costs, more bad publicity and an outcome that was uncertain at best and, at worst, could have resulted in damages against the Company." *Id.*

So too here. Even if the directors had grounds to invoke the "for cause" termination provisions, the directors reasonably could have decided not to invoke those provisions because Fannie Mae likely would have had to spend enormous time and resources over many years litigating the decision. The Board reasonably may have decided that going forward, it was more important to cut ties and dedicate the company's resources to righting the ship.

23

Plaintiffs also contest the directors' decision not to sue Raines and Howard for disgorgement under § 304 of the Sarbanes-Oxley Act of 2002.  15 U.S.C. § 7243(a).  That statutory provision establishes that the SEC may sue the CEO and CFO of a company when the company has been required to restate its earnings due to noncompliance with securities laws.  *Id.*

The problem is that § 304 does not create a private right of action.  And contrary to the suggestion in plaintiffs' brief, which relies on 1970s-era cases, courts today rarely create implied private rights of action; courts generally deem it Congress's prerogative to make that decision.  *See Stoneridge Inv. Partners v. Scientific-Atlanta*, 128 S. Ct. 761, 772-73 (2008); *Kogan v. Robinson*, 432 F. Supp. 2d 1075, 1076 (S.D. Cal. 2006) (holding that § 304 does not create private remedy); *In re Whitehall Jewellers, Inc. S'holder Derivative Litig.*, 2006 WL 468012, at *7 (N.D. Ill. 2006) (same); *In re BISYS Group Inc. Derivative Action*, 396 F. Supp. 2d 463, 464 (S.D.N.Y. 2005) (same); *Neer v. Pelino*, 389 F. Supp. 2d 648, 655 (E.D. Pa. 2005) (same).  As a result, the directors' decision not to devote corporate assets to pursue such an uncertain cause of action was certainly a reasonable one.

In sum on the severance-related claims, the complaint fails to create a reasonable doubt about the Board's disinterestedness to consider a demand because it fails to create a reasonable doubt whether the Board exercised a valid business judgment.[7]

---

[7] Delaware law is not clear about whether, for this kind of *Aronson* business-judgment claim, plaintiffs' demand must show (i) a reasonable doubt about the Board's disinterestedness by showing a reasonable doubt whether the directors exercised a valid business judgment; (ii) a reasonable doubt about the Board's

24

C

Finally, plaintiffs argue that nearly all of the 10 outside directors lacked the necessary "independence" to evaluate the demand because (1) the Raines-controlled Fannie Mae Foundation made charitable donations to non-profit organizations affiliated with individual Board members, (2) the directors had other conflicting business and personal relationships with each other, and (3) Raines otherwise controlled and dominated the directors. *See Rales*, 634 A.2d at 934; *Aronson*, 473 A.2d at 814. "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson*, 473 A.2d at 816.

The brief for the directors dismisses those allegations as plainly insufficient under Delaware law. Yet in their 30-page reply brief, plaintiffs make no mention of this "independence" argument. Although not a waiver, the reply brief's silence on the subject is a telling indication of this argument's lack of weight under Delaware law.

The basic hurdle for plaintiffs stems from the fact that the kinds of relationships alleged in the complaint exist at many companies. Directors tend to be experienced and accomplished business persons; those individuals also tend to be comparatively wealthy and have a wide range of professional and charitable affiliations and relationships. It is usually considered in the interests of corporations and their

---

disinterestedness by showing a "substantial likelihood" that the directors will be personally liable for not exercising a valid business judgment; or (iii) both. It also is not clear whether there is a real difference in these formulations. Regardless, plaintiffs' severance-related claim here does not suffice under any of the possible formulations.

shareholders to attract experienced and accomplished business leaders as directors. So as not to preclude service by such persons, Delaware law creates a very high bar for using the kinds of relationships alleged here as a basis for finding a lack of independence and thereby excusing demand in a derivative suit.

*First,* the complaint alleges that outside directors Duberstein, Gerrity, Malek, Marron, Swygert, and Korologos are beholden to Raines because he was Chairman of the Board of the Fannie Mae Foundation, which made charitable grants to non-profit organizations with which the directors were affiliated. Second Am. Comp. at ¶ 116. For those donations to be relevant, plaintiffs must allege that Raines "has the unilateral power . . . to decide whether the challenged director continues to receive a benefit . . . ." *Orman v. Cullman,* 794 A.2d 5, 25 n.50 (Del. Ch. 2002). But the complaint does not allege any particularized facts showing that Raines controlled who received donations or determined the size of grants. We thus conclude that the contributions to non-profit charities and organizations provide no basis for us to question the independence of the directors for purposes of Delaware law.

*Second,* plaintiffs allege that outside directors Duberstein, Pickett, Korologos, Malek, Marron, Ashley, and Swygert have "business and/or personal relationships with each other, or with immediate families of other defendants, that would conflict with their ability to objectively determine whether it would be appropriate to bring suit against other Fannie Mae current and former officers and/or directors." Second Am. Comp. at ¶ 132. But allegations of "mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence." *Stewart,* 845 A.2d at 1050. Only professional or personal friendships that "border on or even

26

exceed familial loyalty and closeness[] may raise a reasonable doubt whether a director can appropriately consider demand." *Id.* (internal quotation marks omitted). The Delaware Supreme Court has instructed that "[n]ot all friendships, or even most of them, rise to this level and the Court cannot make a reasonable inference that a particular friendship does so without specific factual allegations to support such a conclusion." *Id.* (internal quotation marks and emphasis omitted). We need not dally long on this allegation: The commonplace business, professional, and personal relationships alleged in this case are not remotely sufficient under Delaware law to disqualify the challenged directors from evaluating demand in an independent manner.

*Third*, plaintiffs allege that the directors lacked independence because Raines "controlled" a majority of the Board. But the complaint cites no particularized facts to support this charge other than that the Board often approved Raines's proposed decisions. This does not suffice under Delaware law to demonstrate that Raines so controlled the directors' decisionmaking as to mean they lacked independence to consider a demand. As the Delaware courts have stated, the "shorthand shibboleth of dominated and controlled directors" is insufficient. *Aronson*, 473 A.2d at 816 (internal quotation marks omitted).

In sum, under the standards set forth by Delaware law, the complaint's allegations do not create a reasonable doubt about the Board's independence to consider a demand.

\* \* \*

We affirm the District Court's judgment dismissing the complaint.

*So ordered.*

BROWN, *Circuit Judge*, concurring in the judgment: After 182 pages of briefing by 39 attorneys who have strained to squeeze this case into their preferred courtroom, I still—even after reading the majority opinion—haven't heard a decent argument for federal subject-matter jurisdiction. All parties in this litigation teamed up to manufacture jurisdiction, but, needless to say, parties cannot create subject-matter jurisdiction, *see Kline v. Burke Constr. Co.*, 260 U.S. 226, 233–34 (1922). Neither can judges, for doing so misappropriates Congress's jurisdiction-conferring role, *id.*, and invalidly scoops cases out of state court. And these principles are especially important in a case where Congress amended the supposedly jurisdictional statute to make clear Fannie Mae may only sue or be sued in courts that have "competent jurisdiction"—that is, subject-matter jurisdiction. The majority's misreading of Supreme Court precedent and disregard for statutory text lead it to erroneously conclude we have jurisdiction.

I

Fannie Mae's sue-and-be-sued clause does not, as the majority contends, create "automatic" federal subject-matter jurisdiction, *see* maj. op. at 10, 12–13. Most of the majority's mistakes flow from its misinterpretation of *American National Red Cross v. S.G.*, 505 U.S. 247 (1992).

A

In *Red Cross*, the Court declared "a congressional charter's 'sue and be sued' provision *may* be read to confer federal court jurisdiction if, but only if, it specifically mentions the federal courts." 505 U.S. at 255 (emphasis added). Based on this language, the majority concludes Fannie Mae's sue-and-be-sued clause creates jurisdiction

2

*simply because* it mentions the federal courts. I would apply this silly test if *Red Cross* actually created it. But *Red Cross* did no such thing. Rather, *Red Cross* stands for the unremarkable rule that mentioning federal courts is necessary, but not always sufficient, to confer jurisdiction. Three key rationales support this commonsense interpretation.

First, the majority's reading of *Red Cross* is implausible. Consider this hypothetical statutory provision: "Fannie Mae may sue and be sued in federal court *only if* another statute independently confers subject-matter jurisdiction." Under the majority's test, this hypothetical provision would create "automatic federal jurisdiction" simply because it *mentions* federal courts—even though the text evinces a contrary meaning. But that cannot be; a mere mention of federal courts cannot justify disregarding statutory barriers to federal jurisdiction. In short, the phrase "federal courts" isn't a talisman.

Second, the majority's (mis)interpretation of *Red Cross* is belied by *Red Cross* itself. After all, if a mere textual mention of federal courts was sufficient, then the *Red Cross* Court wasted many pages articulating other rationales and examining the jurisprudential backdrop against which Congress enacted the Red Cross charter. Certainly a brief discussion would have sufficed to create the talismanic "I see the phrase 'federal courts' so it *must* be jurisdictional" test. Instead, *Red Cross* substantially relied on the timing of an amendment to Red Cross's charter by applying the canon that Congress is "presumed to intend [the] judicially settled meaning of terms." *Red Cross*, 505 U.S. at 252, 257; *see K.V. Mart Co. v. United Food & Commercial Workers Int'l Union, Local 324*, 173 F.3d 1221, 1224–25 (9th Cir. 1999) (per curiam) (*Red Cross* is "premised" on this canon). *Red Cross* also discussed numerous sources of legislative history. 505

3

U.S. at 261–62.  But the majority's interpretation would render these portions of *Red Cross* "entirely meaningless,"[1] and "I am reluctant to reach that conclusion about Supreme Court decisions." *Agri Processor Co., Inc. v. NLRB*, 514 F.3d 1, 12–13 (D.C. Cir. 2008) (Kavanaugh, J., dissenting).

Third, *Red Cross*'s use of the word "may" is significant. *Red Cross* announced that a sue-and-be-sued clause mentioning federal courts "*may* be read to confer federal court jurisdiction." *Id.* at 255 (emphasis added).  Importantly, the word "may" is generally "employed to imply permissive, optional or discretional, and not mandatory action." BLACK'S LAW DICTIONARY 979 (deluxe 6th ed. 1990); *see, e.g., United States v. Lexington Mfll & Elevator Co.*, 232 U.S. 399, 411 (1914).  Thus, when a sue-and-be-sued clause mentions federal courts, a court is *permitted* to interpret the clause as conferring jurisdiction, and it should do so only when the statutory text and amendment history support such a reading. *Red Cross* did not command federal courts to shirk their responsibility to examine "the ordinary sense of the language used [and] basic canons of statutory construction," 505 U.S. at 263, in reaching an ultimate conclusion about the clause's meaning.[2]

---

[1] In the critical section of its opinion, the Court relied on the amendment to the Red Cross charter and the "judicially settled meaning" canon. *See* 505 U.S. at 252, 257.  And although the Court discussed legislative history in the context of rejecting a party's arguments, it extensively analyzed the legislative materials rather than declaring such materials irrelevant in light of some newly announced magic-words test. *See id.* at 261–62.

[2] Although the *Red Cross* Court used the phrase "necessary and sufficient," it did so when explaining that previous cases had notified Congress about language sufficient to create jurisdiction. *See* 505 U.S. at 252.  Just because those cases are examples of sufficient jurisdictional language, however, does not mean *any*

4

In sum, under *Red Cross*, a sue-and-be-sued clause mentioning federal courts may (or may not) be jurisdictional—because mentioning federal courts is necessary (but not always sufficient) to confer jurisdiction. And even if *Red Cross* flirted with a magic-words test by emphasizing "federal courts" and ignoring other aspects of the Red Cross charter's text, the Court could not have intended to apply this test where Congress specifically amended the charter to add a jurisdictional limitation, as Congress did here.

B

Interpreting Fannie Mae's sue-and-be-sued clause according to "the ordinary sense of the language used [and] basic canons of statutory construction," *Red Cross*, 505 U.S. at 263, demonstrates the clause does not create subject-matter jurisdiction. According to the majority, a charter provision authorizing Fannie Mae to sue and be sued *"in any court of competent jurisdiction"* is a declaration that all federal district courts have competent jurisdiction. *See* 12 U.S.C. § 1723a (emphasis added); Maj. Op. at 5–13. Because "competent jurisdiction"—a phrase not present in the Red Cross's charter—refers to subject-matter jurisdiction, Fannie Mae may only sue or be sued "in any court" that has an independent source of subject-matter jurisdiction.

In 1954 Congress amended Fannie Mae's charter by inserting the words "[in any court of] competent jurisdiction." *Compare* Pub. L. No. 73-479, § 301(c)(3), 48 Stat. 1246, 1253 (1934) (authorizing Fannie Mae "[t]o sue and be sued, complain and defend, *in any court* of law or equity, State or

---

reference to federal courts *always* suffices even if statutory text indicates otherwise. Moreover, the majority's contention that mentioning federal courts always suffices runs counter to *Red Cross*'s holding that such a reference "may" suffice, *see id.* at 255.

5

Federal" (emphasis added)), *with* Pub. L. No. 83-560, § 201, 68 Stat. 590, 620 (1954) (authorizing Fannie Mae "to sue and to be sued, and to complain and to defend, *in any court of competent jurisdiction*, State or Federal" (emphasis added)). *Red Cross* explained that such "a change in language [should] be read, if possible, to have some effect." 505 U.S. at 263; *see also Fund for Animals, Inc. v. Kempthorne*, 472 F.3d 872, 877 (D.C. Cir. 2006) ("[C]ourts presume that Congress has used its scarce legislative time to enact statutes that have some legal consequence.").

Our task is to determine what Congress accomplished by adding the phrase "[court of] competent jurisdiction." As the Supreme Court has repeatedly emphasized, the phrase "competent jurisdiction" almost always refers to subject-matter jurisdiction. *See, e.g., Wachovia Bank, Nat'l Ass'n v. Schmidt*, 546 U.S. 303, 316 (2006); *United States v. Morton*, 467 U.S. 822, 828 (1984); *Califano v. Sanders*, 430 U.S. 99, 106 n.6 (1977) (suggesting a statute required "an independent jurisdictional foundation" largely because it limited judicial review to "'a court of competent jurisdiction,'" which "seem[ed] to look to outside sources of jurisdictional authority"); *cf. Kontrick v. Ryan*, 540 U.S. 443, 454 (2004). Just two years ago, the Court unambiguously declared: "*Subject-matter jurisdiction* ... concerns a court's *competence* to adjudicate a particular category of cases." *Wachovia Bank*, 546 U.S. at 316 (emphasis added); *see Kontrick*, 540 U.S. at 454 (treating "what cases ... courts are competent to adjudicate" as an issue of subject-matter jurisdiction). "Competent jurisdiction" rarely refers to personal jurisdiction. Indeed, "[a]s far back as *Pennoyer v. Neff*, 95 U.S. 714 (1878), [courts] drew a clear distinction between a court's 'competence' and its jurisdiction over the parties." *Morton*, 467 U.S. at 828 n.6. Leading commentators likewise treat a court's "competence" to hear a case as an issue of subject-matter

6

jurisdiction. *See* 13 CHARLES ALAN WRIGHT, ARTHUR R.
MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND
PROCEDURE: JURISDICTION § 3522 (2d ed. 1984). So does
*Black's Law Dictionary*. BLACK'S LAW DICTIONARY 355,
426 (rev. 4th ed. 1968) (defining "court of competent
jurisdiction" as one "having power and authority of law ... to
do the particular act," and explaining the term "competent
authority," "[a]s applied to courts," means "legal authority to
deal with the particular matter in question"); *id.* 379, 459 (3d
ed. 1933) (same).

The majority contends the Supreme Court overruled this
well-settled meaning of "competent jurisdiction" in one vague
half-sentence in *Breuer v. Jim's Concrete of Brevard, Inc.*,
538 U.S. 691 (2003). *See* Maj. Op. at 9. But "[c]ourts do not
normally overturn a long line of earlier cases without
mentioning the matter," *John R. Sand & Gravel Co. v. United
States*, 128 S. Ct. 750, 756 (2008), and they especially do not
do so in equivocal half-sentences. Perhaps this is why the
parties—who have not exactly been shy about making
jurisdictional arguments that stretch the bounds of credulity—
refused to place much reliance on *Breuer*, even when
specifically prompted to do so at oral argument.[3]

Flailing to find some meaning for the statute's "compe-
tent jurisdiction" limitation, the majority claims Congress
inserted this phrase to "clarify that ... litigants in state courts
of limited jurisdiction must satisfy the appropriate jurisdic-

---

[3] The majority's selective quotations from *Breuer* do not accu-
rately reflect the vagueness of the relevant passage, in which the
Court first concluded the plaintiff could bring his claim in district
court, then quoted a statute containing "competent jurisdiction"
language, and then remarked that "the district courts would *in any
event* have original jurisdiction over FLSA claims under 28 U.S.C.
§ 1331 ... and § 1337(a)." 538 U.S. at 694 (emphasis added).

7

tional requirements." *See* Maj. Op. at 7. I disagree. For if authorization "to sue and be sued ... in any court of competent jurisdiction, State or Federal," clarifies that there must be a separate source of state jurisdiction, why does it not also clarify that there must be an independent source of federal jurisdiction? *See* 12 U.S.C. § 1723a(a). Surely "competent jurisdiction" modifies both "State" and "Federal" in Fannie Mae's charter. *See id.* In addition, the majority's citation of the statute construed in *Osborn v. Bank of the United States* is ironic, because the "competent jurisdiction" phrase in that statute only referred to state courts (but not federal courts). *See* 22 U.S. (9 Wheat.) 738, 817 (1824) (authorizing suit "in all state courts having competent jurisdiction, and in any circuit court of the United States"). If, as the majority asserts, Congress added "competent jurisdiction" to Fannie Mae's charter to clarify that an independent jurisdictional grant is required in state (but not federal) courts, one would expect the verbal formulation to look something like the statute in *Osborn*. It does not.

In another effort to give "competent jurisdiction" some meaning, appellees imply the phrase might refer to personal jurisdiction. Although this interpretation is contrary to the phrase's ordinary meaning, *Morton*, 467 U.S. at 828 n.6, the majority embraces this interpretation, *see* maj. op. at 7–8. However, appellees' half-hearted argument is quite telling, because the furthest they will go is to argue personal jurisdiction *occasionally* represents one "*component* of a court's 'competent jurisdiction.'" Rule 28(j) Letter, Apr. 21, 2008 (emphasis added); *cf. Blackmar v. Guerre*, 342 U.S. 512, 513–16 (1952) (interpreting "competent jurisdiction" to require personal jurisdiction, but giving no indication that an independent source of subject-matter jurisdiction was not also required). There are two types of jurisdiction: personal jurisdiction and subject-matter jurisdiction. *Cf. Kontrick*, 540

8

U.S. at 455; 1 ROBERT C. CASAD & WILLIAM M. RICHMAN, JURISDICTION IN CIVIL ACTIONS § 1-1 (3d ed. 2004). If, as appellees argue, personal jurisdiction is one of the components of a court's "competent jurisdiction," then the other component must be subject-matter jurisdiction. Thus, appellees' best argument is that the sue-and-be-sued clause requires personal jurisdiction *and* an independent source of subject-matter jurisdiction. If that is the case, the sue-and-be-sued clause does not create subject-matter jurisdiction.

The majority also suggests the words "competent jurisdiction" "clarify that ... litigants relying on the 'sue-and-be-sued' provision can sue in federal district courts but not necessarily in all federal courts." Maj. Op. at 7–8. But the authority cited by the majority directly undercuts this proposition. The majority cites the Supreme Court's conclusion that Red Cross's authorization to sue and be sued in federal court only includes district courts—not all federal courts. See Maj. Op. at 8 (citing *Red Cross*, 505 U.S. at 256 n.8; *id.* at 267 (Scalia, J., dissenting)). But if that is the case, Congress would have no need to clarify this point by adding the "competent jurisdiction" language.

At bottom, the majority provides no convincing reason to give the statute's words anything other than their ordinary meaning. Because "competent jurisdiction" refers to subject-matter jurisdiction, Fannie Mae's sue-and-be-sued clause is functionally equivalent to the hypothetical statute described at the beginning of this opinion: Fannie Mae may sue and be sued "in any court of competent jurisdiction," meaning it may only sue in a court with an independent basis of jurisdiction. Yet the majority presses its counter-textual conclusion that this clause *creates* jurisdiction. I disagree, and the additional interpretive principles to which I now turn support my textual analysis.

9

*Red Cross* relied on the canon that Congress is "presumed to intend [the] judicially settled meaning of terms," 505 U.S. at 252, but that canon undercuts the majority's position here. In 1942, the Court held the FDIC's charter was jurisdictional. *See id.* at 254. Just five years later, in 1947, Congress amended the Red Cross's charter, making its language "in all relevant respects identical" to the FDIC's charter. *Id.* at 257. The *Red Cross* Court found this significant, explaining "Congress may well have relied on [the Court's 1942 holding] to infer" that amending the Red Cross's charter in this way would make it jurisdictional. *Id.* at 260; *see id.* at 263; *K.V. Mart*, 173 F.3d at 1224–25 (*Red Cross* is "premised" on this principle). But *Red Cross*'s rationale cuts exactly the opposite way here. Fannie Mae's charter had contained text virtually identical to that already deemed jurisdictional by the Court, but then Congress decided to add a phrase that functions as a jurisdictional restriction. Thus, unlike *Red Cross*, where the amendment "tug[ged] hard toward a jurisdictional reading," *id.* at 263, here Congress inserted a phrase that militates against such a reading.

In addition, Congress placed the "competent jurisdiction" limitation in Fannie Mae's sue-and-be-sued clause—but not Freddie Mac's clause, which is almost the same in every other respect. *Compare* 12 U.S.C. § 1723a(a) (authorizing Fannie Mae "to sue and to be sued, and to complain and to defend, *in any court of competent jurisdiction*, State or Federal" (emphasis added)), *with* 12 U.S.C. § 1452(c) (authorizing Freddie Mac "to sue and be sued, complain and defend, in any State, Federal, or other court"). We should be reluctant to disregard this important difference in language—especially when the two provisions containing the disparate language appear in the same title of the U.S. Code and involve such

10

interrelated organizations as Fannie Mae and Freddie Mac. *See, e.g., Branch v. Smith*, 538 U.S. 254, 281 (2003) (plural-ity) (noting "it is, of course, the most rudimentary rule of statutory construction ... that courts do not interpret statutes in isolation, but in the context of the *corpus juris* of which they are a part").

In sum, each interpretive tool utilized by the *Red Cross* Court—statutory text, the amendment timeline of the charter juxtaposed against relevant Supreme Court decisions, interpretive canons, and other statutory provisions— demonstrates Fannie Mae's sue-and-be-sued clause does not create jurisdiction.

C

At first blush, it might seem reasonable for subject-matter jurisdiction to exist in all cases where a federally chartered entity such as Fannie Mae is a party. However, a federal court cannot declare it has power (jurisdiction) over a case simply by declaring it would be good policy for it to have that power. *See Pub. Citizen v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1287–88 (D.C. Cir. 2007) ("[T]his court simply is not at liberty to displace, or to improve upon, the jurisdictional choices of Congress," and "[d]iscretionary considerations of 'fairness or efficiency' do not authorize us ... to disregard plain statutory terms assigning a different court initial subject-matter jurisdiction over a suit."). I cannot employ such a self-aggrandizing approach, because it is not courts' job to make policy—much less when that policy inflates the judicial role at the expense of Congress and the states. *See Kline*, 260 U.S. at 234 (holding the lower federal courts "derive[] [their] jurisdiction wholly from the authority of Congress"); WRIGHT, MILLER, & COOPER, *supra*, § 3522 ("[I]f the federal courts ... entertain cases not within their

11

jurisdiction," an "unconstitutional invasion of the powers reserved to the states" occurs.) Yet today the majority gives Fannie Mae an "automatic" ticket out of state court anytime it is sued—something only Congress can do.

Moreover, if policy choices are relevant to this inquiry, they at least need to comport with those of Congress. Two points are relevant here. First, Congress statutorily rejected the notion that federal courts should always have subject-matter jurisdiction in cases where a federally chartered entity is a party. While "involvement of a federally chartered corporation" *used to be* sufficient to create federal subject-matter jurisdiction, *Red Cross*, 505 U.S. at 251, Congress in 1925 "diminish[ed] the flood of federal litigation" resulting from this policy, *Gov't Nat'l Mortgage Ass'n v. Terry*, 608 F.2d 614, 621 n.10 (5th Cir. 1979), by limiting "the [policy's] reach ... to federally chartered corporations in which the United States owned more than one-half of the capital stock," *Red Cross*, 505 U.S. at 251. This statutory limitation remains today. *See* 28 U.S.C. § 1349. Second, we do not know why Congress placed the "competent jurisdiction" limitation in Fannie Mae's charter, but not in Freddie Mac's. Congress treated these similar entities differently in this respect. But, needless to say, it is not our role to upset that judgment. Moreover, if the disparate statutory language resulted from a legislative oversight, it is "beyond our province to rescue Congress from its drafting errors, and to provide for what we might think ... is the preferred result." *Lamie v. U.S. Trustee*, 540 U.S. 526, 542 (2004).

II

For the majority to be correct about the meaning of the sue-and-be-sued clause, one of the following three propositions must be true. First: The Supreme Court held that merely

12

mentioning the phrase "federal courts" always creates jurisdiction, even where the rest of the clause plainly indicates it does not create jurisdiction. Second: Congress's amendment of Fannie Mae's charter to specifically insert the phrase "[in any court of] competent jurisdiction" is meaningless. Or third: The phrase "in any court of competent jurisdiction" has a meaning completely at odds with Supreme Court precedent (even though there is no convincing evidence to support such an interpretation). Because none of these is even plausible, I would hold we lack subject-matter jurisdiction.